Donald D. ROGERS, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–85–0911–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Jan. 15, 1987.

Rehearing denied Feb. 5, 1987.

Jim Skelton, Houston, for appellant.

John B. Holmes, Jr., Harris County Dist. Atty., Eleanor M. McCarthy, Gladys Aguero, Harris County Asst. Dist. Attys., Houston, for appellee.

EVANS, C.J., and LEVY and DUGGAN, JJ.

## OPINION

LEVY, Justice.

A jury found the appellant guilty of indecency with a child and assessed his punishment at six years confinement and a fine of $6,000.

At the time of the alleged offense, appellant, a 50–year-old man, was living with his girlfriend and her 17– and 15–year-old daughters. The complainant, the girlfriend's niece, resided with her grandparents and her father down the street from the appellant's house. The complainant was nine years old at the time she was allegedly molested by the appellant and ten years old at the time of trial.

The complainant testified that sometime around the Thanksgiving holidays in 1984, she spent the night at appellant's house. She said that she fell asleep on the appellant's couch but later awoke in the appellant's bed with the appellant sexually molesting her.

Appellant appeals his conviction on two points of error. In his first point, appellant contends that the prosecutor's conduct during the trial, particularly her sidebar remarks, assumption of inflammatory facts not in evidence, prejudicial remarks stating her personal opinion, and improper bolstering, was manifestly improper and indicated a willful and calculated effort to deny the appellant a fair trial, thereby resulting in fundamental error. We agree.

It is impossible to appreciate fully the extent and impact of the misconduct without reciting the testimony at some length to show the setting in which the objectionable matter occurred. The following excerpts from the statement of facts are primarily from cross-examination by the State's prosecutor of appellant and appellant's character witnesses:

(Cross-examination of appellant)

Q. You just answer my question; did Michelle try to commit suicide twice?

A. I have no way of knowing.

Q. Was she hospitalized?

A. For suicide?

Q. Yes.

A. Not to my knowledge, no.

Q. She lived there with you for four years?

A. Yes.

Q. She has a psychologist and a psychiatrist, doesn't she?

A. She has a doctor.

Q. And you're her emotional problem, aren't you?

A. She didn't blame me, if that's what you're asking.

Q. *And she doesn't like you because you do the same thing to her as you tried to do to Teresa?*

A. She never said that.

Q. *Michelle never said that or cried out for that?*

A. Michelle has never said that—pardon me.

Q. *Isn't that what the referral is all about, Harris County Children's Protective Services?*

A. No, ma'am.

\* \* \* \* \* \*

Q. Tammy stays with you, doesn't she?

A. Yes, she does.

Q. She didn't leave when Marilyn left?

A. No, she didn't.

Q. *And Tammy has been living with you for the past four years going through the same thing as Michelle, hasn't she?*

A. Is going through the same thing?

Q. *The same thing, sexual abuse?*

A. That is not true.

Q. *Of course Tammy is going to come in here and say that's not true, too, isn't she?*

A. You'll have to ask Tammy those questions, won't you?

Q. *But I guess when it's been going on for four years like Mrs. H_____ said, she just learned to live with it.*

A. Mrs. H_____, to my knowledge, didn't say Tammy has been abused any time.

Q. No, but she said that children just learn to live with it after awhile. Children

learn to live with it after awhile, don't you agree?

A. I don't know.

\* \* \* \* \* \*

Q. *Did you try to do the same abuse that you did to Teresa, and to Michelle and that's why she had to see the psychiatrist?*

A. I didn't abuse Teresa nor have I abused Michelle.

Q. Nor Tammy?

A. I have corrected Michelle on many occasions.

\* \* \* \* \* \*

Q. You're also Michelle's guardian angel, aren't you?

A. No.

Q. *But you are definitely Tammy's sugar daddy?*

A. I'm very nice to her, yes. I'm good to both of them.

Q. *I guess after four years, Tammy has learned to live with it, hasn't she?*

A. She has learned to live a lot better life than what she had before, yes.

\* \* \* \* \* \*

Q. Is that it?

A. I believe so. The mayor of Pasadena, ex-mayor showed up out there.

Q. Don't forget him, right?

A. I just remembered him.

Q. Don't forget the ex-mayor of Pasadena; what's his name.

A. Jim Clark.

Q. Of course he's going to say you're a wonderful man.

A. I sure hope so.

Q. *Have you ever heard the old saying a wonderful man behind closed doors?*

A. I'm sorry. Would you repeat?

Q. *Wonderful men behind closed doors?*

A. No, I never have.

Q. *They portray themselves in front of the public in one way but look out when they shut the door behind them at home.*

A. I haven't heard that, no. Is that one of yours?

Q. No, just asking you if you heard it.

A. No, I haven't.

\* \* \* \* \* \*

Q. And I think you said yesterday you have five children?

A. Yes.

Q. You're sure about that?

A. Am I sure about I have five children?

Q. Uh-huh.

A. I raised five children.

Q. Is that the only number of children that you have?

A. No, I have other children than that.

Q. You have two others, don't you?

A. Yes, I do.

Q. D–Ray and Kathy?

A. Yes, I do.

Q. Their mother is married, isn't she?

A. Yes.

Q. Where are they right now, in Louisiana?

A. Yes, they live in Louisiana.

Q. How old was Mary when she gave birth to Kathy?

A. That's been awhile back; she was—

Q. *Thirteen.*

A. Oh, my goodness no.

Q. How old is she now?

A. She's 47, I believe, somewhere in there.

Q. *She wasn't thirteen years old when she gave birth to Kathy?*

A. No, she was not.

Q. And you were twenty?

A. I was twenty-one when I met Mary; I believe twenty or twenty-one.

Q. And you were still married to the wife, the only wife you have been married to?

A. Yes, I was separated.

\* \* \* \* \* \*

Q. *And is your testimony that Mary was not thirteen and then fifteen when she gave birth to Kathy and D–Ray?*

A. *No, I think she was probably sixteen.*

Q. *Try thirteen and fifteen.*

A. *She was not thirteen and she was not fifteen.*

Q. *And you were not married to Mary?*

A. No, I was not.

Q. *And you were approximately twenty-one?*

A. I was twenty or twenty-one, yes.

Q. In the State of Texas?

A. Yes.

Q. Any other children you forgot to fill us in about?

A. No, I believe you got them.

\*　　\*　　\*　　\*　　\*　　\*

(Cross-examination of M＿＿ M＿＿.)

Q. Let me make sure I understand all these years. *You first met the defendant when you were thirteen—I mean when you were nineteen years old?*

A. *Yes, ma'am.*

Q. *And he's fifty now, is that correct?*

A. *Yes, ma'am.*

Q. *That would have made him 37?*

A. *Yes, ma'am.*

Q. *And Tammy first met him at the age of thirteen?*

A. *No.*

Q. *Or younger?*

A. *Younger.*

Q. *But she was thirteen when Tammy moved into the house?*

A. *Moved into the house—thirteen would be right; five years from seventeen.*

Q. *And he was 45?*

A. *Same age, yes.*

Q. *And Teresa is ten now and he's fifty now?*

A. *Yes.*

Q. *Now you see a pattern?*

A. No, I don't.

Q. Do you know who Mary is?

A. Yes, I do.

Q. Mary is the mother of his two other children, I believe one of his sons, D–Ray, by that union with Mary. You said he lived in there for a little bit?

A. Yes, he did.

Q. And Mary gave birth to two kids?

A. She did.

Q. And how old was Mary—I think Kathy is the oldest—when Kathy was born?

A. Mary is 47 now. I think Kathy is around 22 or 23. I'm not sure of Kathy's age.

Q. You sure about Mary's age?

A. I believe so.

\*　　\*　　\*　　\*　　\*　　\*

Q. When you sleep on the couch where does Tammy sleep?

A. In her room.

Q. Never sleeps with the defendant?

A. We've all slept in there from time to time watching TV. She may spend the night in there.

Q. You find that quite normal that he sleeps with Tammy alone in the room?

A. Sleeping; no, I find nothing abnormal about that.

Q. Has Tammy ever told you what happens in that room with him and her?

A. No, there's nothing that happens in there for her to tell me.

Q. And if there was you wouldn't do anything about it anyway, would you?

A. I certainly would. I'm a mother first.

\*　　\*　　\*　　\*　　\*　　\*

Q. *And it's also your testimony that Michelle and Tammy have never told you about any sexual abuse or advances made by this defendant?*

A. No.

\*　　\*　　\*　　\*　　\*　　\*

(Cross-examination of T＿＿ M＿＿.)

Q. You think he's just a wonderful person.

A. I certainly do; he's my father.

Q. *A wonderful person who gets, while he's married to your mom, another woman pregnant and bears two children by that woman.*

A. That was between my mother and my father. I had nothing to do with it.

Q. A wonderful person that meets up with M____ M____ when she's nineteen. Is he still married to your mom?

A. I suppose he was.

Q. Is he a religious man?

A. He goes to church.

Q. And he lives with this person named M____ M____ for five years with two children of hers and he never marries her. This is this wonderful person, right?

* * * * * *

(Cross-examination of J____ N____.)

Q. *Would your opinion of him change if you knew that at the age of twenty one, him telling it she was 16 years old, me telling it, she was 14 years old, while he was still married to his wife, Nelda, he had two children by a 14 year old girl?*

A. No, my opinion would not change.

Q. *Would your opinion of him change if you knew at the age of 32 while he was still married and considering the first facts situation that I told you he took up with a nine year old girl?*

A. I don't understand, what you are saying.

Q. *Well, at the age of 21 he was married to his wife and a 14–year girl got pregnant and she had two children by him. At the age of 32 while he was still married to his wife and the 14–year old still had the two children, he took up with a 19–year old girl, would your opinion of his character change?*

A. I think this is absurd because I don't think anything of his—

Q. Would your opinion of him change if you knew—

* * * * * *

Q. *Would your opinion of him change if you also added to that fact that he tried to French kiss and fondle thirteen year old Michelle, when she was thirteen?*

A. That's absurd.

* * * * * *

(Cross-examination of G____ M____.)

Q. *If it was occurring in his home with Michelle and Tammy this defendant wouldn't do it in front of Terry.*

A. No, Terry would know about and Terry would tell me.

Q. And Terry would tell because that's what you taught Terry to tell?

A. That's right.

Q. But we don't know what Donald Rogers has taught Michelle and Tammy. We can't read his mind, can we?

A. No, you can't but you can know him well enough to know.

Q. But you will agree with me that child abuse is a sickness?

A. Yes.

Q. Sometimes a sickness for someone crying out for help?

A. I ain't sure about that.

Q. And this picture that you've just painted of the defendant, I guess it leaves me with the impression that he's either a Saint or god-like. Is that the impression you want to leave?

A. No.

* * * * * *

(Cross-examination of S____ H____.)

Q. I've never met you before in my entire life, have I?

A. No, ma'am.

Q. And I don't know Michelle; I've never spoken to her?

A. No, ma'am.

Q. Promise me, Shawna, you'll tell me the truth.

A. I promise.

Q. Try to remember February of 1985. You're Michelle's best friend.

A. Yes, ma'am.

Q. *And I can't help her right now because she won't tell the truth.* But do you remember her going to her grandma's house?

[N.B.: M____ M____ had not yet testified at this point in the trial].

A. I was with her at the time.

Q. Do you remember her grandmother asking her about scratches on her chest?

A. I do.

Q. Did Michelle tell you that—well, did Michelle tell her grandma that Donald had put those scratches on her chest?

A. Yes, ma'am, she said that they was getting in an argument and Donnie was going to spank her and she jerked away and when she did, he accidentally scratched her.

Q. Did she say accidentally? Shawna, are you absolutely sure?

A. I'm positive.

Q. They were four deep scratches.

A. They were not deep.

Q. Do you remember that Michelle's grandma was going to talk to Marilyn?

A. Yes, ma'am.

Q. And she was going to talk to Marilyn about Teresa?

A. Yes, ma'am.

Q. And do you remember when you were there that her grandma turned to Michelle and said, "Has Donnie been doing anything bad to you, Michelle?"

A. Yes, ma'am.

Q. What did Michelle say?

A. She said—

Q. Tell the truth, Shawna, please tell the truth.

A. I'm telling you the truth, she said no. She said nothing, you know, nothing had been happening.

Q. *Do you remember Michelle telling your grandma and telling when you were there that Donnie tried to French kiss her and tried to put his hands where they didn't belong?*

A. *I don't remember that.*

Q. What kind of power does he have over you?

A. *Excuse me?*

Q. *What has he told you not to say?*

A. He hasn't told me anything. He just—I came over to their house last night and he asked me what all I knew and I just

told him and he said, "Well, would you be willing to tell this in court?"

And I said, "Yeah, I would".

Q. *So Michelle never said that he tried to French kiss her and he tried to put his hands where they didn't belong?*

A. I do not remember it.

\* \* \* \* \* \*

Q. Why did she tell you she had to go to the hospital?

A. Because she wasn't getting along with people—with the people at her house and she said she put herself there because she wanted to get away.

Q. Come on, Shawna, why would she want to get away?

A. Well, we had talked about and I asked her why and she said because she felt like—she felt like Tammy—Tammy is a good runner and stuff and Michelle is not good in athletics and she felt that was why.

Q. *Isn't it because she saw something happening to her sister that was just coming down the road for her?*

A. That doesn't look that way to me.

Q. *Come on, Michelle tells you these things. What happens when Tammy and this defendant go into the back room?*

A. They watch TV or talk.

Q. *They don't sleep together? They don't have sex back there, do they?*

A. No, not since I've known them, no.

Q. *You're not telling the truth and I don't understand why.*

A. Why do you think I'm not telling you the truth? How do you know I'm not? I don't understand.

Q. There's a referral made by the Harris County Children Protective Services. Do you remember a man named Joe? Michelle ever tell you she talked to a man named Joe and I'm going to spell his last name for you; M-A-R-I-C-E-V-C-I-H. I can't say it right.

A. I've never talked to him.

Q. No, Michelle talked to him.

Q. What is he?

A. He works for the Harris County Children's Protective Services.

A. She's never told me she has talked to him.

Q. *She's never told you that she has told him this after they found out that something was going wrong in the house?*

A. And she's never told me she talked to him. She has told me that she has talked to people but she didn't give me specific names.

Q. She never told you that she told Dr. Griffin?

A. She told me she has talked to Dr. Griffin but never told me what about and stuff. She told me she's gone and talk to him.

Q. *Would it surprise you that it was Dr. Griffin who called the Harris County Children's Protective Services and said, "You may have a problem out there in that home."*

DEFENSE COUNSEL: Excuse me, I'm going to object to this.

THE COURT: Sustained.

\* \* \* \* \* \*

Q. *And you're saying she never told you that this defendant tried to French kiss her or tried to put his hands where they didn't belong?*

A. She's never told me that.

A. *Or that her sister sleeps with him and she's afraid that she's next?*

Q. She's never told me that either. As many times—I spent the night over there many times and everytime I have, Tammy slept in her own room and Pops has slept in his and me and Michelle slept in hers.

A. I'm sure, Shawna, it doesn't happen then.

\* \* \* \* \* \*

Q. How about Tammy; she gets to stay because she's now seventeen.

A. She's seventeen so she can make her own mind.

Q. It's clear for Tammy because she is an adult under the law.

A. Yes, Tammy has a right to do what she wants.

Q. That's right; her 17th birthday gave her that?

A. Yes, ma'am.

Q. *But we can still protect Michelle, can't we?*

A. *Yes, but what are you suppose to protect her against?*

Q. *I don't know Shawna, you tell me?*

A. *There's nothing to protect her against.*

Q. *You think everything is all right? You think her going to the hospital was all right, you think her mom taking her out of that home was all right?*

A. Yes, if that's what they needed.

Q. And the only reason so far that I've heard is because they don't get along because she's being disciplined?

A. No, not because she's being disciplined. It's just that she felt she wasn't getting along with him.

Q. And that was the only reason?

A. Yes.

Q. You're smarter than that, Shawna.

A. I'm not suppose to pass judgment upon people.

\* \* \* \* \* \*

Q. *You think she's safe now?*

A. *Yes, I do.*

Q. *And as long as you feel she's safe you're going to stick to this story?*

A. I'm going to stay with my story because I have no reason to change it. I'm not lying.

Q. Well, I believe you care about her and I believe you love her.

A. She's my best friend, she's like my sister.

Q. *But I don't believe you have her best interest at heart.*

A. *What do you mean by that?*

Q. *Do you believe that the victims of sexual abuse need just as much help as the criminals?*

A. *Yes, I do.*

Q. *And we can't get each side's help unless both sides speak up.*

A. *But what if they haven't done it but just being accused of it?*

Q. *And that's what you believe that Michelle is not a victim but she's put herself in the hospital?*

A. Yes.

Q. Just because she's having problems at home?

A. Yes, I do believe that.

\* \* \* \* \* \*

(Cross-examination of T_____ B_____.)

Q. *And do you remember ever telling Michelle what was happening to you when you were alone in the house with this defendant?*

A. Nothing ever happened to me so I didn't have anything to tell.

Q. *Isn't it true that you have been having sexual intercourse with this man for the last four years?*

A. No, that is not true; that's a lie.

Q. It's not true?

A. No, ma'am.

Q. You never said that to Michelle?

A. No, I haven't

Q. Michelle never told a case worker about that?

A. No, not that I know of.

Q. She never told her doctor about that?

A. No.

Q. And the reason you're staying there at the house is because you want to finish high school?

A. Yes, I do, that's my home.

\* \* \* \* \* \*

Q. Isn't it true, Tammy, that you're going to say anything, unfortunately, to make sure that this man looks like the pillar of the community to this jury because he's looking at twenty years in the penitentiary?

A. No, because I'm telling the truth.

Q. *I don't believe you, Tammy.*

A. Well—

Q. *And I thought I could help you but I want to help your little sister because you know she's not seventeen yet. And it's your testimony that you've never been molested or sexually abused by this defendant?*

A. Yes, it is.

Q. *And you're sister has never told you that she has come close to and that's why she's so scared?*

A. She is not scared and no, she has never told me that.

Q. *And if she had told you you wouldn't tell me anyway, would you?*

A. Yes, I would.

Q. *No, you wouldn't. You love this man.*

DEFENSE COUNSEL: Objection, Your Honor.

THE COURT: Sustained.

Q. You love him?

A. Yes, I do.

Q. You're going to do anything to make sure he doesn't get in trouble, aren't you?

A. No, that's not true. If he had molested me, I would confess.

Q. You would?

A. Yes, I would.

\* \* \* \* \* \*

(Cross-examination of M_____ M_____.)

Q. You made a statement that when you went to this caseworker named Joe, you lied to him?

A. Yes, ma'am. I did.

Q. So you lied to him when you said that this person you called Pops tried to French kiss you and tried to put his hands where they didn't belong?

A. Yes, ına'am.

Q. You remember seeing a Dr. Griffin?

A. Yes, I do.

Q. Do you remember telling him about your problems at home and about the French kissing and about putting the hands where they don't belong?

A. Yes, ma'am.

Q. So you lied to him?

A. Yes, ma'am, but he did not believe me.

Q. So when you told him you lied?

A. Yes, ma'am.

Q. You remember telling your grandma that the defendant tried to French kiss you?

A. When?

Q. When you and Shawna were together and your grandma was going to talk to Marilyn about Teresa?

A. No, ma'am, I did not tell her that then.

Q. Never told your grandma?

A. Not then.

Q. When did you tell her?

A. It was after that.

Q. How much after that?

Q. I don't know; a week maybe.

Q. So when you told her you were lying again?

A. Yes, ma'am.

\* \* \* \* \* \*

Q. *You can also love your Pops, the person who takes care of you, even knowing he's a child abuser?*

A. No, but he didn't do that to me.

Q. So you see how you hate one person, you love one person but you can't love the other one.

A. There's a difference. That was done— you're saying it was if it was done to me.

Q. *No, I'm not saying it was done to you. I'm saying it was done to Teresa. Let's say for example you can still love him?*

A. I don't believe it.

Q. But if it were true, if it was a fact you would still love him?

A. If it was a fact I think inside of me, yes.

\* \* \* \* \* \*

Q. So when you told the doctor and the caseworker about the eight muscle relaxants and taking the overdose, that was a lie too?

A. Yes, ma'am, I was in too deep.

Q. What does that mean, "in too deep?"

A. Well, you get to a certain point and it's just embarrassing to turn back around.

Q. *So ... lies upon lies upon lies.*

A. *Well, I'm not lying now.*

Q. *That I don't believe.*

The State replies that in most of the instances cited by appellant as constituting improper and harmful cross-examination by the prosecutor, the appellant failed to make any objection at trial. Absent a timely objection, no error is presented for review. *Cisneros v. State,* 692 S.W.2d 78, 82 (Tex. Crim.App.1985); *Sanchez v. State,* 589 S.W.2d 422 (Tex.Crim.App.1979). In those few instances where the appellant did make an objection that was sustained, the State contends that no error was preserved due to appellant's failure to request an instruction to disregard. *Duran v. State,* 505 S.W.2d 863, 866 (Tex.Crim.App.1974).

The State is correct that no error was preserved by timely objection, followed by the appellant's request for an instruction to disregard and a motion for mistrial. However, the appellant contends that even though many errors have not been properly preserved, such error is so pervasive throughout the entire trial as to be fundamental because it denied the appellant a fair and impartial trial. We conclude that the record supports a finding that, *because fundamental fairness was vitiated,* the present case is an exception to the general rule that improper questions and arguments by a prosecutor cannot constitute reversible error unless the error is properly preserved.

■ In cross-examining a reputation witness, the State is permitted to ask the witness if he has heard of a specific act of misconduct by the defendant, *Henderson v. State,* 617 S.W.2d 697 (Tex.Crim.App.1981), but the question is not to be framed so as to imply that the act has actually been committed, *i.e.,* an assertion of the truth of the matter. *Id.* at 699. The long-established rule governing prosecutions for crime in this State is that the accused is to be tried upon the merits of each case alone, and that proof of extraneous crimes or of specific acts of misconduct by the accused

is generally not admissible. *Mounts v. State*, 148 Tex.Crim. 149, 185 S.W.2d 731 (1945).

■ Merely asking an improper question will generally not constitute reversible error and may be cured or rendered harmless by either a withdrawal of the question or by an instruction to disregard. *Brown v. State*, 692 S.W.2d 497 (Tex.Crim.App.1985); *White v. State*, 444 S.W.2d 921 (Tex.Crim. App.1969); *Castro v. State*, 651 S.W.2d 1 (Tex.App.—Houston [14th Dist.] 1982, no pet.). An exception to that general rule is in extreme cases where the question is obviously harmful to the defendant, or where it appears that the suggestive question is without evidentiary foundation and is clearly calculated to inflame the minds of the jury, being of such character as to suggest the impossibility of withdrawing the impression produced on their minds. *Henderson*, 617 S.W.2d at 700; *White*, 444 S.W.2d at 922; *Castro*, 651 S.W.2d at 4. Where improper questions in the cross-examination of a character witness have been asked, the Texas Court of Criminal Appeals has not hesitated to reverse solely on the basis of the improper prejudicial question. *Els v. State*, 525 S.W.2d 11, 14 (Tex.Crim. App.1975).

■ Although the State may ask questions concerning the defendant's reputation, it is reversible error to ask an improperly framed question asserting as fact the defendant's prior acts of misconduct. *Smith v. State*, 513 S.W.2d 823, 828 (Tex. Crim.App.1974); *Castro*, 651 S.W.2d at 4. Whenever a question is so asked as to amount to an assertion of fact that implies the commission of another offense, its harmfulness cannot be cured by the answer or failure to answer, or by any instruction that the court may give, and reversible error is reflected thereby. *Parasco v. State*, 168 Tex.Crim. 89, 323 S.W.2d 257 (Tex.Crim.App.1959); *McNaulty v. State*, 138 Tex.Crim. 317, 135 S.W.2d 987 (1939); *see also Baker v. State*, 154 Tex.Crim. 627, 230 S.W.2d 219 (1950). In *Baker*, the court stated that questions construed as assertions that the specific acts of misconduct by the defendant did in fact occur constitut-

ed unsworn evidence before the jury on matters that were not proper for impeachment purposes, even if testified to by witnesses.

Though several of the questions and statements by the prosecutor in the present case were improper and constituted reversible error, the question remains whether the appellant waived such error by failing to object, request an instruction to disregard, and move for a mistrial.

In *Johnson v. State*, 604 S.W.2d 128 (Tex.Crim.App.1980), the defendant contended on appeal that the prosecutor engaged in improper jury argument resulting in error. The court held that because the defendant failed to correctly preserve error resulting from any improper jury argument, nothing was presented for review. The court stated, however, that it would not hesitate to reverse judgment *when the prosecutor engages in conduct calculated to deny the accused a fair and impartial trial. Id.* at 135. The court noted in that case that only two of the allegedly improper arguments by the prosecutor actually resulted in misstatements of the law, and also that the record did not disclose a willful and calculated effort on the part of the prosecution to deny the appellant a fair and impartial trial.

In *Boyde v. State*, 513 S.W.2d 588 (Tex. Crim.App.1974), the defendant objected to an improper jury argument by the State's prosecutor that was sustained by the trial court, but no further relief was requested. The Texas Court of Criminal Appeals held that "even if instruction to disregard had been requested and granted, the prejudicial effect of the prosecutor's argument would not have been removed." *Id.* at 591. The court concluded that even though the error may not have been properly preserved, such prosecutorial misconduct could not be labeled harmless and required the reversal of the conviction. *Id.* at 593; *see also Bray v. State*, 478 S.W.2d 89 (Tex.Crim. App.1972).

■ An additional fact to consider is whether the prosecutor asked the question in bad faith. *Carrillo v. State*, 591 S.W.2d 876, 893 (Tex.Crim.App.1979). *Where*

*there is serious and continuing prosecutorial misconduct that undermines the reliability of the factfinding process or, even worse, transforms the trial into a farce and mockery of justice,* as occurred here, *resulting in deprivation of fundamental fairness and due process of law,* the defendant is entitled to a new trial even though few objections have been perfected. *See Berger v. United States,* 295 U.S. 78, 84, 88, 55 S.Ct. 629, 631, 633, 79 L.Ed. 1314 (1935); *Ruth v. State,* 522 S.W.2d 517 (Tex. Crim.App.1975); *Kerns v. State,* 550 S.W.2d 91 (Tex.Crim.App.1977). Reversal is justified to reaffirm the critical importance of convicting the accused *only* upon the evidence presented, without attempting to inflame or prejudice the minds of the jurors. *Boyde,* 513 S.W.2d at 591, 593; *Stein v. State,* 492 S.W.2d 548, 551 (Tex. Crim.App.1973).

In furtherance of such reaffirmation, we think that the following admonition by the United States Supreme Court is applicable to a State prosecutor equally as to a federal one:

> That the United States prosecuting attorney overstepped the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense is clearly shown by the record. He was guilty of misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and, in general, of conducting himself in a thoroughly indecorous and improper manner.
>
> ....
>
> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern it all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring out a just one.

*Berger,* 295 U.S. at 84, 88, 55 S.Ct. at 631, 633.

 The prosecutor's quoted questions and side-bar comments could serve no purpose other than to inflame and prejudice the minds of the jurors and thereby deprive the appellant of a fair and impartial trial. If convictions cannot be obtained without resort by the prosecutor to such methods—aptly called not hard blows, but foul ones—then the State is not entitled to them. Considering the allegations of prosecutorial misconduct in light of the record as a whole, the record amply supports a finding that the prosecutor was not acting in good faith. This inference is particularly justified by the many instances where the prosecutor appears to fabricate inflammatory facts and suggest them into evidence by cross-examination. Such zeal and indignation exceed the bounds of professional propriety. It seems trite but necessary to observe that our criminal system is accusatorial, not inquisitional, where the Rules of Evidence, not prosecutorial fury, are to prevail, and the prosecutor is not permitted to assume the role of Torquemada. Though the appellant failed to properly preserve many errors resulting from the prosecutor's misconduct, the facts of the present case, in which *impermissible prejudice permeates the entire record,* indicate that even frequent instructions to dis-

regard would not have sufficed to remove the prejudice. The misconduct was pronounced and persistent, with a probable cumulative effect upon the jury.

In view of our disposition of this first point of error, it is not necessary to discuss appellant's second point. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Ingham v. State,* 679 S.W.2d 503 (Tex.Crim.App.1984).

The judgment of the trial court is reversed, and the cause is remanded.

EVANS, C.J., dissenting.

EVANS, Chief Justice, dissenting.

The extensive record chronicles the course of a vigorously prosecuted and well-defended adversarial proceeding.

The State's initial presentation was brief and factual. It consisted of the 9–year-old complainant's narration of the occurrence and an investigative report by a children's social worker. After this presentation, the State rested.

Appellant testified in his own defense. On direct examination, he postured himself as a proper and decorous 50–year-old father of five and the innocent victim of a spoiled, unruly child and her vindictive grandmother. He denied having sexually molested the complainant and suggested that the charges against him stemmed from a quarrel he had with complainant's grandmother. On cross-examination, appellant denied that he had any sexual relations with either of his girlfriend's two teenage daughters, that he customarily slept in the same bed with one of them, or that he had watched X-rated movies with them and the complainant. He described the complainant as very unruly, said she lacked manners and had no respect for other people, and suggested that her story was a fabrication encouraged by her "super vicious" grandmother. Appellant's girlfriend and her two daughters gave similar testimony, confirming appellant's version of the matter. Appellant also called numerous character witnesses who testified on his behalf.

My reading of the trial record suggests that the prosecutor became outraged by the appellant's attempt to portray himself as a family man, a person of high ideals, and an innocent victim of the complainant's fabricated story. The prosecutor's indignation was not diminished by the appellant's condescending manner during cross-examination, in which he occasionally called the prosecutor "Sugar." In her vigorous cross-examination, the prosecutor relentlessly hammered at appellant's credibility and often resorted to leading questions and innuendos to depict the appellant as a perverted child molester.

I agree with the majority that the prosecutor's trial tactics did not meet acceptable standards of professional conduct, because they demonstrated her personal belief that appellant was guilty and his testimony unbelievable. *See* Supreme Court of Texas, Rules Governing the State Bar of Texas art. X, sec. 9, (Code of Professional Responsibility) DR–7–106 (1973). But I do not agree that this necessitates a reversal of the conviction.

Appellant points to only two instances in which he made any objection whatsoever to the prosecutor's conduct, and in both those instances, the court sustained his objection. When the objections were sustained, appellant made no request for an instruction to disregard or for any other relief. In my opinion, appellant waived any right to complain on appeal. *Duran v. State,* 505 S.W.2d 863, 866 (Tex.Crim.App.1974).

I am also of the opinion that the prosecutor did not exceed the bounds of proper prosecutorial conduct in trying to show appellant's prior sexual relations with the teenage daughters of his girlfriend. Under the particular circumstances of the case, I believe those circumstances were admissible to rebut the impression left by the appellant that he was a person of such high integrity and character that he would not have committed the offense, *Boutwell v. State,* 719 S.W.2d 164, 179 (Tex.Crim.App.

1986); *McDonald v. State,* 513 S.W.2d 44 (Tex.Crim.App.1974), and also to rebut appellant's contention that he had been falsely accused by the complaining witness. *Boutwell,* 719 S.W.2d at 179. But the question of admissibility need not be resolved here, because appellant waived any complaint by his failure to object.

For the reasons stated, I would overrule appellant's first point of error.

I would also overrule appellant's second point of error in which he claims he was denied a fair trial due to ineffective assistance of counsel.

The obvious strategy of appellant's trial counsel was to destroy the credibility of the complainant's testimony. To do this, appellant sought to prove by an overwhelming number of defense witnesses, that he could not possibly have been a child molester because he was such a fine person and a family man.

Although other trial lawyers might disagree with defense counsel's judgment, it was within the ambit of his trial strategy to refrain from objecting to the prosecutor's conduct, being confident that appellant's witnesses could withstand the onslaught of her aggressive interrogation. Indeed, appellant's counsel might reasonably have counted on the jury becoming offended by the prosecutor's overzealous and abusive behavior, thereby gaining sympathy for appellant.

Gauging the adequacy of the defense counsel's performance by the totality of his representation, I do not consider that his performance fell below the objective standard of "reasonably effective assistance of counsel." *Ex parte Raborn,* 658 S.W.2d 602 (Tex.Crim.App.1983). Neither does the record indicate a reasonable probability that, but for defense counsel's errors in judgment, the result of appellant's trial would have been any different. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Ingham v. State,* 679 S.W.2d 503 (Tex.Crim. App.1984).

For the reasons stated, I would affirm the trial court's judgment.