**Reversed and Remanded in Part; Affirmed in Part and Memorandum Opinion filed October 8, 2024**



In The

# Fourteenth Court of Appeals

---

### NO. 14-23-00231-CR

---

### ABDUL-RAHMAN KHAN, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 338th District Court
Harris County, Texas
Trial Court Cause No. 1513777**

---

### MEMORANDUM OPINION

A jury convicted appellant Abdul-Rahman Khan of murder and sentenced him to serve 50 years in prison and assessed a $10,000 fine. *See* Tex. Penal Code § 19.02. Appellant appeals his conviction in multiple issues. In his first issue appellant argues that the trial court abused its discretion when it denied his request for the inclusion of a self-defense instruction in the jury charge. We overrule this issue because there was no evidence of appellant's subjective intent at the time he

shot and killed the complainant, Peter Pina. In his second issue appellant argues that the State committed prosecutorial misconduct when it refused to adhere to an alleged agreement regarding the inclusion of a self-defense instruction in the jury charge. We overrule this issue because the record is devoid of any evidence of an agreement between the parties regarding admission of extraneous offense evidence or the inclusion of a self-defense instruction in the jury charge. Appellant argues in his third issue that the State again committed prosecutorial misconduct when, during the punishment phase of appellant's trial, it questioned a defense witness about the teachings of Islam related to the commission of murder. We overrule this issue because appellant failed to preserve it in the trial court. Finally, appellant argues in his fourth issue that the trial court erred when it assessed costs against appellant based on a statute that was not in effect at the time the offense was committed. We sustain this issue and reverse the part of the court's judgment that improperly assessed court costs and remand to the trial court for proper calculation of court costs.

## BACKGROUND

The Electric Chair was a tattoo parlor located on Richmond Avenue in Houston, Texas. In addition to general signage identifying the type of shop, The Electric Chair had a sign posted at the entrance prohibiting the carrying of handguns. Inside the Electric Chair there were several rooms including a cash room, computer room, and a sterilization room. There were signs at the door into the sterilization room prohibiting access to customers. In addition to the rooms mentioned above, there were tattooing areas separated by half-walls.

Several people were working at The Electric Chair late in the evening of June 14, 2016. Among them was the complainant, a piercer. Others working that night were Jose Ramos, Carlos Lopez, and Charlie Ramirez, all tattoo artists.

2

Lopez was tattooing Ramirez's brother-in-law, Adam Kiscadon. Simultaneously, Ramirez was tattooing his sister, Kiscadon's wife. Ramirez testified that since there was no security at the shop, he and the other workers paid attention to what was going on and the people entering the shop.

About 11:00 p.m. appellant and a friend entered the tattoo parlor. Appellant's friend was interested in a tattoo. Ramos talked with appellant's friend and took him into the shop's computer room to discuss designs for the tattoo. While this was going on appellant variously wandered about the shop looking at the artwork posted on the walls or sat in the waiting area at the front of the shop. During his wanderings appellant approached Lopez while he was tattooing Adam Kiscadon. Lopez described appellant as already upset when he approached him and asked about getting a tattoo. Lopez denied that there were any arguments with appellant that night before the shooting. The security camera footage of the waiting area at the shop showed appellant pull a handgun out of his pants and hold it out in front of him. Up to this point, appellant had not caused any disturbances.

A couple entered the shop and the complainant took them into a room where he gave the female what appears to be a nose piercing. As the couple exited the shop, appellant got up and wandered into the back of the shop. Soon thereafter, Ramirez heard the complainant say: "Come on buddy, you got to get out of here." Ramirez stood up and he saw the complainant and appellant in the sterilization room. Appellant was sitting on a countertop inside the sterilization room, a small room customers were not supposed to enter. The complainant repeated his admonition to appellant and he gave Ramirez a "subtle nod," a sign to come and assist him with appellant.

Ramirez exited his tattoo stall and moved toward the sterilization room. He saw the complainant talking to appellant, who was beginning to dismount from the

3

countertop. As Ramirez came closer, he did not hear the complainant yell or scream at appellant. Ramirez also did not see the complainant touch appellant, slap him, or punch him. Ramirez also did not see the complainant point a gun or knife at appellant. According to Ramirez, the complainant did not have a weapon of any kind. Ramirez moved into the sterilization room and came up behind appellant in an attempt to get him in a full nelson wrestling hold and move him out of the shop through the backdoor, which automatically locks when it closes. Ramirez was successful at getting a grip on appellant's left hand. Ramirez grabbed appellant's long hair with his right hand, but he was not able to restrain appellant's right hand. The complainant was in front of appellant and Ramirez. Appellant managed to keep his right hand free by sliding out from under Ramirez. As Ramirez and appellant struggled, all three moved into the small hallway outside the sterilization room. Appellant then managed to use his free right hand to draw his handgun and shoot the complainant once in the chest. Ramirez explained that when appellant fired, he held the handgun "at a 90-degree angle at chest length." At this point, Ramirez grabbed at the handgun, and they started falling backwards. A second shot went off right by Ramirez's head as they fell to the floor. The two men continued to struggle on the floor. Ramirez managed to get control of the handgun and slid it down the hallway toward the front of the shop. Kiscadon then joined the fray, but appellant continued to struggle. Ramirez grabbed a pair of brass knuckles from his tattoo stall and hit appellant with them. Even though he was mostly subdued, appellant continued to struggle to get out from under Kiscadon until the police arrived on the scene.

The complainant was pronounced dead at the scene. An autopsy was conducted on the complainant's body. The autopsy confirmed that the complainant's death was caused by a single gunshot wound to the upper right side

of the complainant's chest. The autopsy also revealed gunpowder stippling[1] in the vicinity of the gunshot wound which meant that the complainant was between six inches and two feet of the handgun when it fired, with the assistant medical examiner clarifying that it was probably "closer to the 2 feet end."

During appellant's trial, appellant's counsel spent much time on Ramirez's actions that night. During his cross-examination appellant's defense counsel questioned Ramirez about whether the complainant "had [appellant] by the shoulder." Ramirez responded "I know at one point in time when I looked back there, I seen this arm, and I don't know if it was a suggestive tap that he go, or anything. But I remember seeing arms like this and him pointing, and I turned around and got a view of it and him saying, 'Come on buddy.' I heard it twice." Defense counsel continued focusing on the events leading up to the shooting:

Defense Counsel: So it's your testimony here today that when [the complainant] was face-to-face with [appellant], that there was essentially no conflict, right?

Ramirez: I don't know. I wasn't in the room the entire time.

Defense Counsel: Okay. So there could have been physical contact and fighting, you just wouldn't have seen it?

. . . .

Ramirez: When I walk in the room, [appellant] was already coming off the table turning towards [the complainant]. So I have no idea what's going on.

Defense Counsel: Right. [The complainant] was grabbing [appellant] and [appellant] was, to use your words, shrugging him off, right?

---

[1] The assistant medical examiner testified that stippling is the name given to the scratches on the surface of skin caused when unburnt gunpowder particles strike the skin. She explained that the closer a gun is to the skin surface when it is fired, the area of stippling is more compact. She continued that the further away the gun is when it is fired, there is more dispersion of the unburnt gunpowder to spread out causing a more dispersed stippling pattern. She described the stippling pattern on the complainant's skin as "being more spread out."

5

| | |
|---|---|
| Ramirez: | I wouldn't see [the complainant] grabbing him. [The Complainant] is a very suggestive person. He's a bouncer. He deals with drunk people all the time. I've been to the bar he works at. He's pretty much the person – at one point the most passive person. So I wouldn't see [the complainant] crossing that line. |
| Defense Counsel: | Okay. So I lost you. Was it a, yes, you saw him being physical with [appellant] or, no, you did not see him being physical with [appellant]? |
| Ramirez: | I seen his arm in an area where he might have touched him. |
| Defense Counsel: | Uh-huh. |
| Ramirez: | No physicality. |

Appellant's cross-examination continued after a bench conference with appellant's counsel asking Ramirez if he was "saying that when you lost sight of [appellant], that –." Ramirez interjected at this point that the complainant "did not have hold of him." Ramirez then clarified that the complainant "did not have hold of [appellant] when I lost sight of him." Appellant's cross-examination continued:

| | |
|---|---|
| Defense Counsel: | Okay. And then when you gained sight again, you made a comment before we had a recess about how [the complainant] could have been physical with [appellant]. What did you mean by that? |
| Ramirez: | Not physical; jerking, more of a suggestive path. It was more of a – I wouldn't say he was grabbing hold, more of a suggestive path to go on. |
| Defense Counsel: | Okay. And when does the shrugging off start? |
| Ramirez: | Like, he shrugging him off because he's spinning off the table. You can kind of see it. I'm walking in the room, he's kind of got this motion of shrugging his hand off. Just like when we were standing there and I was where [the complainant] was and I had my hands like this, there's a little motion where I seen [appellant] kind of shrug his |

6

|                  | shoulder as he's standing up. |
|------------------|-------------------------------|
| Defense Counsel: | So then you would agree with me that [the complainant] was placing his hands on [appellant], right? |
| Ramirez:         | I mean, I'm a very aware person. I can tell when someone is beside me. And if somebody is beside me, I might shrug like, get the fuck away from me, even though they are not touching me. So I can't really say. In the vicinity and my line of eyesight, it's a possibility [the complainant] could have been touching him. It's a possibility that he could have just shrugged him off. |
| Defense Counsel: | So that's a yes, right? |
| Ramirez:         | When I walked in there, I seen a little shrug motion. |
| Defense Counsel: | Uh-huh. |
| Ramirez:         | There's a possibility [the complainant] could have been touching him, or had touched him in the quick second that I walked around the corner. |

According to Ramirez, it was at this point in time that he began his effort to place appellant in a full nelson wrestling hold to escort him out of the tattoo parlor. From this point in time, Ramirez did not see the complainant punch or strike appellant. In Ramirez's opinion, once he began struggling with appellant, it would have been impossible for the complainant to hit appellant because everything happened so quickly. Ramirez also testified during re-direct that if someone had punched appellant as they moved out of the sterilization room, Ramirez would have felt it. Ramirez continued that he felt no such force.

After the State rested, appellant did not testify, nor did he call any witnesses to testify. The jury found appellant guilty. After hearing the evidence admitted during the punishment phase of appellant's trial, the jury assessed his punishment at 50 years in prison and a $10,000 fine. This appeal followed.

ANALYSIS

**I.     The trial court did not abuse its discretion when it denied appellant's requested self-defense instruction.**

It is a defense to prosecution if a person's conduct is justified by Chapter 9 of the Texas Penal Code. Tex. Penal Code § 9.02. Under Chapter 9, one generally is justified in using force against another when and to the degree one reasonably believes the force is immediately necessary to protect oneself against another's use or attempted use of unlawful force. *Id.* § 9.31(a). When the force in question is deadly,[2] the person is justified in using such force in self-defense if the above test is met, and the person reasonably believed that deadly force was immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force. *Id.* § 9.32(a). Appellant argues in his first issue on appeal that the trial court abused its discretion when it denied his requested self-defense instruction. We disagree.

A defendant is entitled to a jury instruction on self-defense when requested, if the issue of self-defense is raised by the evidence, "whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the defense." *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017). When reviewing a trial court's denial of a request for a self-defense instruction, we view the evidence in the light most favorable to the defendant's requested submission. *Id.* A trial court errs in denying a self-defense instruction if there is some evidence, from any source, when viewed in the light most favorable to the defendant, that will support the elements of self-defense. *Id.* A reviewing court must, however, consider the plausibility of the evidence raising

---

[2] "Deadly force" is force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury. Tex. Penal Code § 9.01(3).

8

the defense. *Lozano v. State*, 636 S.W.3d 25, 29 (Tex. Crim. App. 2021). We review the trial court's decision to deny a defensive issue in a jury charge for an abuse of discretion. *See Wesbrook v. State*, 29 S.W.3d 103, 122 (Tex. Crim. App. 2000).

In *Lozano*, the Court of Criminal Appeals reiterated that the "reasonably believes" language found in Penal Code section 9.32(a)(2) "contains subjective and objective components." *Id.* at 32. It continued that a defendant must "subjectively believe" that another person used or attempted to use unlawful force or deadly force against the defendant "and that the defendant's use of unlawful or deadly force in response was immediately necessary." *Id.* The court then stated that "a defendant's subjective belief must be reasonable." *Id.* The court explained that a "reasonable belief is one held by an ordinary and prudent man in the same circumstances as the actor." *Id.* (internal quotations omitted). It explained that "a person's belief, absent direct evidence, generally must be inferred from the circumstances of the case." *Id.* at 33. It clarified that evidence of a defendant's reasonable belief need not come from the defendant but could also come from the testimony of other witnesses about the defendant's actions and words at the time of the offense. *Id.*

As mentioned above, the defendant did not testify, nor did he call any witnesses, including his companion on the night of the shooting, during the guilt-innocence phase of his trial. The only evidence offered by appellant was a stipulation of evidence which provided that if Officer Arroyo had been called to testify as a witness, "she would testify that Charlie Ramirez never told her anything about brass knuckles during the complete time that they exchanged information." Therefore, any evidence of appellant's subjective belief that his use of deadly force was immediately necessary when he shot the complainant must

come from the witnesses called by the State.

Appellant nevertheless argues that the testimony and other evidence introduced by the State provided sufficient evidence to require the trial court to submit his requested deadly force self-defense instruction. In his appellate briefing, appellant points out the following evidence in support of his argument. As explained below, we conclude none of the proffered evidence required the trial court to submit the requested deadly force self-defense instruction.

Appellant initially argues that the following excerpts from Ramirez's testimony supports the inclusion of the self-defense instruction: (1) the complainant worked as a bouncer; (2) Ramirez and the complainant made eye contact before Ramirez came up behind appellant to get him in a wrestling hold; and (3) appellant did not hear or see Ramirez approach him from behind. We conclude appellant's proffered evidence does not support appellant's argument because, as appellant admits, he was unaware of this information and thus it could not impact his subjective belief regarding the need to use deadly force. *Lozano*, 636 S.W.3d at 32 (stating that a defendant must "subjectively believe" that another person used or attempted to use unlawful force or deadly force against the defendant "and that the defendant's use of unlawful or deadly force in response was immediately necessary.").

Next appellant points out that: (1) the complainant "confronted" appellant about being in the sterilization room; (2) the complainant was in "intimate proximity" to appellant; (3) the complainant was between six inches and two feet of appellant; and (4) appellant was "sandwiched" between the complainant and Ramirez. We once again conclude that appellant's proffered evidence does not establish that the trial court abused its discretion when it refused to include the self-defense instruction. The evidence establishes only that the complainant found

10

appellant in a room he was not supposed to be in and told him, twice, that he needed to get out of the room. There was nothing from this evidence suggesting that appellant faced a deadly threat. The result is the same with respect to appellant's contention that the complainant and Ramirez were close to appellant after the complainant told him to leave the sterilization room. Undisputed evidence also establishes that the sterilization room and adjacent hallway were small. Regardless, the fact that the workers at the tattoo parlor were close to appellant when he was being asked to vacate the sterilization room does nothing to establish his subjective belief that he faced a deadly threat. *See id.*

Finally, appellant points to evidence that (1) Ramirez attempted to place appellant in a full nelson wrestling hold but succeeded only in grabbing his left arm and hair; and (2) the two men struggled and eventually fell onto the floor after appellant shot the complainant.[3] We conclude the evidence of this non-lethal struggle between appellant and Ramirez does not support the inclusion of appellant's requested deadly force self-defense instruction. *See Lozano*, 636 S.W.3d at 34 (concluding defendant did not suffer egregious harm from incorrect self-defense instruction because evidence did not support including a deadly force self-defense instruction in the charge); *Werner v. State*, 711 S.W.2d 639, 644 (Tex. Crim. App. 1986) ("In [the] absence of evidence of use or attempted use of deadly force by the deceased, the statutory defense permitted by § 9.32 is not available, and a defendant is not entitled to a jury instruction."); *Leibengood v. State*, 866

---

[3] In his brief appellant asserts that the three men, appellant, the complainant, and Ramirez, struggled. However, having reviewed the entire record, we conclude there is no evidence that the complainant did anything more than possibly tap or touch appellant's shoulder when he told him to get out of the sterilization room, which occurred before Ramirez entered the room and while appellant was still sitting on a countertop or table in the sterilization room. This does not support a deadly force self-defense instruction. *See Lozano*, 636 S.W.3d at 34 (concluding there was no evidence supporting inclusion of multiple assailants' deadly force self-defense instruction).

S.W.2d 732, 736 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd) ("Here, [defendant] never testified that he believed it was necessary to kill the victim to protect himself from death or serious bodily injury."); *Bray v. State*, 634 S.W.2d 370, 373 (Tex. App.—Dallas 1982, no pet.) ("As to the third element of Section 9.32, there is no evidence in the record that [the victim] used or attempted to use deadly force so as to justify Bray's deadly response. Bray does not articulate any apprehension that [the victim] was about to employ deadly force and neither the acts, nor words without acts, of [the victim] can be said to threaten deadly force.").

Because there was no evidence establishing appellant's subjective belief that he needed to use deadly force when he shot the complainant, we conclude that the trial court did not abuse its discretion when it denied appellant's requested deadly force self-defense instruction.[4] We overrule appellant's first issue.

## II. The State did not engage in prosecutorial misconduct when it opposed appellant's requested self-defense instruction because there is no evidence of an agreement.

In his second issue appellant argues that the State engaged in prosecutorial misconduct when it opposed appellant's requested self-defense instruction because of an alleged agreement between the parties. We have reviewed the entire record and find nothing supporting appellant's contention that the parties agreed the State would not oppose the inclusion of a deadly force self-defense instruction in the jury charge. As a result, we find nothing in the appellate record supporting appellant's argument that the State engaged in prosecutorial misconduct. We

---

[4] Appellant's reliance on the *Durden* opinion from this court does not change this result because in *Durden* the record contained some evidence of the defendant's subjective intent. *See Durden v. State*, 659 S.W.3d 26, 37 (Tex. App.—Houston [14th Dist.] 2023, pet. ref'd) ("Moreover, contrary to the State's argument, we conclude the trial record contains evidence of appellant's state of mind applicable to the analysis—her reasonable belief that her use of force was immediately necessary to prevent Paul from raping her.").

12

overrule appellant's second issue.

## III.    Appellant did not preserve his third issue.

In his third issue appellant contends that the State engaged in prosecutorial misconduct during the punishment phase of appellant's trial when it questioned one of appellant's witnesses, Gloria Garcia, regarding Islam's teachings on murder. Garcia testified on direct that she was like a second mother to appellant. Garcia further testified that she met appellant and his family because her husband and appellant's father met for prayers every day at the mosque. She concluded her direct testimony by asking the jury to exercise mercy and leniency when sentencing appellant.

The State then cross-examined Garcia about the teachings of Islam on taking another's life. Appellant argues this line of questioning by the State constituted prosecutorial misconduct because it was willful and calculated to inflame the jury's prejudices. The State responds that appellant did not preserve this argument in the trial court. We agree with the State.

It is well settled that prosecutorial misconduct is an independent basis for objection that must be specifically urged to be preserved. *Hajjar v. State*, 176 S.W.3d 554, 566 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd); *see Clark v. State*, 365 S.W.3d 333, 339–40 (Tex. Crim. App. 2012) (concluding that due process complaint based on alleged prosecutorial misconduct must be raised in trial court to be preserved). The proper method of preserving error in cases of prosecutorial misconduct is to (1) object on specific grounds and obtain a ruling, (2) request an instruction that the jury disregard the comment, and (3) move for a mistrial. *See* Tex. R. App. P. 33.1(a); *Penry v. State*, 903 S.W.2d 715, 764 (Tex. Crim. App. 1995); *Cook v. State*, 858 S.W.2d 467, 473 (Tex. Crim. App. 1993).

Appellant admits that he did not object to the allegedly improper line of questions by the prosecutor which he asserts constituted prosecutorial misconduct. Attempting to avoid the rules of error preservation, appellant cites *Rogers v. State* in which our sister court asserted that the rules of error preservation may not strictly apply in a case where "serious and continuing prosecutorial misconduct that undermines the reliability of the factfinding process, or even worse, transforms the trial into a farce and mockery of justice" and results in a "deprivation of fundamental fairness and due process of law." 725 S.W.2d 350, 360 (Tex. App.—Houston [1st Dist.] 1987, no pet.). In *Rogers* the court determined that preservation was not necessary because the prosecutor questioned a witness in bad faith and made inflammatory allegations during the questioning lacking any evidentiary support. *Id.* at 360. We conclude *Rogers* is distinguishable because appellant has not shown that the prosecutor here asked Garcia questions about Islam's teachings on the punishment of murderers in bad faith. Instead, she asked the questions responding to Garcia's direct testimony asking the jury to be lenient and merciful in assessing appellant's punishment. *See Vernon v. State*, 571 S.W.3d 814, 825 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd) (distinguishing *Rogers* because questioning at issue was prosecutor's attempt to impeach witness's testimony that created a false impression of defendant); *Johnson v. State*, 432 S.W.3d 552, 562 (Tex. App.—Texarkana 2014, pet. ref'd) (distinguishing *Rogers* and holding defendant failed to preserve prosecutorial misconduct complaints for appellate review). We conclude *Rogers* is distinguishable and hold that appellant was required to preserve error through a contemporaneous objection. Because appellant did not object in the trial court, we hold that he did not preserve his third issue for appellate review. We overrule appellant's third issue.

## IV. The trial court erred in assessing costs.

14

In appellant's fourth issue he asserts the trial court erred in assessing court costs. Specifically, appellant contends the trial court erred in assessing court costs under a statute not applicable to appellant due to the date of commission of the offense.

In its judgment the trial court assessed total court costs of $290, which consisted of $185 Consolidated Court Cost-State and $105 Consolidated Court Costs-Local. The consolidated court costs are authorized by sections 133.102 and 134.101 of the Local Government Code. *See* Tex. Loc. Gov't Code §§ 133.102; 134.101. The consolidated fees listed on the cost bill in the record apply only to defendants who were convicted of offenses committed on or after January 1, 2020. *See id.*; *Rhodes v. State*, 676 S.W.3d 228, 232–33 (Tex. App.—Houston [14th Dist.] 2023, no pet.). It is undisputed that the offense for which appellant was convicted was committed in 2016. The State concedes the court costs were improperly assessed.

Because the record does not reflect the court costs that should have been assessed under previous legislation, we sustain appellant's fourth issue, reverse that portion of the court's judgment that improperly assessed court costs, and remand to the trial court for proper calculation of court costs. *See McLeod v. State*, No. 14-22-00684-CR, 2023 WL 8263659, at *9 (Tex. App.—Houston [14th Dist.] Nov. 30, 2023 (pet. ref'd) (sustaining appellant's issue on appeal when trial court improperly calculated court costs under the new statute and remanding to trial court for proper calculation of court costs).

15

## CONCLUSION

We affirm the judgment of conviction and sentence.  We reverse the portion of the judgment that incorrectly assessed court costs.  We remand to the trial court for proceedings consistent with this opinion.


/s/     Jerry Zimmerer
        Justice


Panel consists of Justices Jewell, Zimmerer, and Hassan.

Do Not Publish — TEX. R. APP. P. 47.2(b).