**Affirmed and Opinion Filed December 27, 2016**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-00821-CR

### TIMOTHY JAMES TAYLOR, Appellant
### V.
### THE STATE OF TEXAS, Appellee

### On Appeal from the 366th Judicial District Court
### Collin County, Texas
### Trial Court Cause No. 366-80945-2012

## MEMORANDUM OPINION

Before Justices Bridges, Evans, and Whitehill
Opinion by Justice Whitehill

A jury convicted appellant Timothy James Taylor of continuous sexual abuse of a young child and indecency with a child by contact. It assessed punishment of life imprisonment on the first count and twenty years' imprisonment on the second count. The trial court rendered a separate judgment on each count.

Appellant raises six issues. His first two issues argue that the trial court erred by admitting certain outcry evidence because (i) the outcry statements were too general and (ii) some of the outcry statements were overheard by (rather than said to) the outcry witness. His remaining issues argue that (iii) the trial court erroneously allowed a detective to testify about appellant's credibility, (iv) the trial court erroneously allowed an unqualified witness to testify about "grooming," (v) cumulative error, and (vi) prosecutorial misconduct.

We overrule appellant's issues and affirm the trial court's judgments.

## I. BACKGROUND

### A. Summary

The State's theory was that appellant repeatedly molested J.E., the daughter of appellant's long-term girlfriend, over roughly a two-year period while the family was living on a farm in or near McKinney, Texas. J.E. was ten or eleven years old when the abuse started in roughly 2009. She made an outcry to her aunt shortly after Christmas 2011, and the aunt notified law enforcement.

There was no physical evidence that appellant had molested J.E. Both J.E. and appellant testified, and the trial came down largely to a swearing match between them.

### B. Trial Evidence

There was evidence at trial to support the following facts:

In roughly 2004, appellant began a long-term relationship with a woman named Danielle, who at trial was often referred to as "Dannie." She already had three children from a prior relationship: J.E. and two younger sons. Appellant, Dannie, and her children moved from Colorado to Texas in 2005. Appellant and Dannie had a daughter together in early 2006.

#### 1. The Canton Incident

The blended family lived in Canton, Texas, from early 2006 until roughly late 2008. J.E. testified that there was one incident while the family was living in Canton. She testified that appellant went into her room very early one morning to wake her up for something, and "he took his thum[b] and he started rubbing my vagina and trying to wake me up." She further testified that she told her mother, and her mother did not believe her at first. According to J.E., her mother talked to appellant about it and he denied it, and J.E.'s mother forgave him.

Appellant testified that he did not touch J.E.'s vagina while they were living in the Canton house. He acknowledged that J.E. complained to Dannie that appellant had touched J.E.

–2–

inappropriately, and he testified that he and Dannie and J.E. talked about it and he apologized to J.E.

Dannie testified that J.E. complained that appellant had touched her on her "inner thigh leg," which appellant denied. Dannie believed appellant because she was standing in the doorway when the abuse allegedly happened.

### 2. The McKinney Abuse

The family moved from Canton to the Dallas area, where they lived for five or six months. In the summer of 2009, they moved to a farm in or near McKinney. There the family lived in a mobile home. J.E. described the mobile home as being "in bad condition" and "trashy." Appellant, Dannie, and their daughter slept in a bedroom, and J.E. and her two brothers slept in the living room.

From June to October 2011, an intern named Esther Richardson lived with them on the farm. While she was there, she slept in the living room and the children slept in a large tent in the front yard.

J.E. testified to the following facts: A couple of months after the family moved to McKinney, appellant began to sexually assault her at night. He would go into the living room and get into bed with her. The first time he assaulted her, he rubbed her vagina "on top of [her] clothes." Then he went back to the bedroom. After that, appellant assaulted her almost every night for the next two years. After the first time, appellant rubbed J.E.'s vagina under her underwear. J.E. also described some specific incidents in which appellant (i) licked J.E.'s vagina and "started to go like inside of" her, (ii) licked his fingers and stuck his finger inside of her, and (iii) licked his fingers and was "circling [her] breasts" under her shirt. J.E. also testified that when she was sleeping in the tent, appellant would come into the tent and "do the same things" by rubbing her and "go[ing] inside of" her.

–3–

Appellant testified to the following facts: He never digitally penetrated J.E. or gave her oral sex. He also testified more equivocally; during his direct examination, appellant's counsel asked, "Did you ever put any of your—for digital penetration, did you ever put any of your fingers inside of [J.E.]?" and appellant answered, "No, sir. Not that I know of." Appellant acknowledged that he would sometimes go lie in J.E.'s bed, and he explained that he did so because his and Dannie's daughter would get out of J.E.'s bed and get into his and Dannie's bed, where she would "kick [him] and things." He also testified that he would lie in the tent with the children in the evening until the youngest child went to sleep.

### 3. The Outcries

Esther Richardson, the intern who lived at the farm from June to October 2011, testified that J.E. made an outcry to her during that time. Before the outcry, Richardson felt uncomfortable about the way appellant and J.E. interacted. On one occasion soon after her arrival, she went to an amusement park with the family, and she described appellant and J.E. as "cuddling" while they were standing in line, and she thought appellant was touching J.E. inappropriately. She also described appellant's and J.E.'s manners around each other as "flirtatious."

Richardson testified that J.E. made an outcry in August 2011 while she and J.E. were taking care of the farm's goats. Richardson was telling J.E. about some problems in Richardson's family, including verbal abuse. J.E. then told Richardson that there was a time when she was asleep in the tent and appellant had come in, cuddled up next to her, and "touched her private areas." Richardson asked J.E. if she had told anyone else, and J.E. replied that she

–4–

had told her mother, and her grandmother knew about it somehow, but "it was kind of just swept under the rug." Richardson did not call the police and or tell anyone else what J.E. told her.[1]

The other outcry witness was Brandi Taylor, who was married to appellant's brother Andrew. They lived in Sachse from 2010 until shortly before appellant's trial in 2014. Brandi and Andrew had five children, and the families got together from time to time.

On or about December 28, 2011, Dannie called Brandi crying and told her that she and appellant had had a fight. Appellant, Dannie, and the children were in the process of moving from McKinney to Gun Barrel City at the time. Appellant had left after the fight and taken the youngest child with him. Brandi went and got Dannie, J.E., and J.E.'s two brothers. Later, Andrew and Dannie went and got the youngest child from appellant. Dannie stayed with Brandi and Andrew for about a week, and the children stayed with them for several months. The children were happy the first few days, but then J.E. and the older of her two brothers became angry and withdrawn.

After J.E. became angry and withdrawn, Brandi asked her what was happening and if there was anything she wanted to talk about. J.E. said that she was upset that Dannie was going to be working things out with appellant because Dannie had promised that it was over. J.E. then told Brandi that she wanted to tell her something but made Brandi promise not to do anything until Dannie came back to Brandi's house, which was supposed to be in a couple of days, and J.E. knew she was safe. Brandi promised. Then J.E. said that appellant had been coming into the living room after Dannie went to sleep, crawling into bed naked with her, and "touching her down there."

---

[1] J.E. also testified about her outcry to Richardson, but her testimony conflicted with Richardson's. J.E. testified that Richardson asked her if appellant ever did inappropriate things to her, and J.E. lied and answered, "No." J.E. further testified that she later told Richardson the truth, but only after J.E. had told her aunt, Brandi Taylor. This was after Richardson had left the farm.

The day Dannie was supposed to return to Brandi and Andrew's house, she sent Brandi a text message saying that she and appellant were coming to get the children. Brandi took the children to the Sachse Police Department before Dannie and appellant arrived. At the police station, Brandi overheard J.E. tell a police officer that appellant "had inserted a finger in her and was touching the bump." J.E. also told the officer that it happened more than ten times. The Sachse police then sent Brandi and the children to the McKinney Police Department because the incidents had happened in Collin County.

## C.    Judicial Proceedings

Appellant was indicted on one count of continuous sexual abuse of a child under 14, one count of indecency with a child under 17 by touching her breast, and a third count that was later dropped. Appellant pled not guilty.

At trial, the State called five witnesses: (i) Richardson, (ii) Brandi Taylor, (iii) Detective Phyllis Jackson, who interviewed appellant soon after Brandi took the children to the McKinney Police Department, (iv) J.E., and (v) Stacy Wendling, who conducted the forensic interview of J.E. at the Children's Advocacy Center of Collin County. Appellant testified in his own defense, and he also called Dannie and his mother, Terri Carlson, as witnesses.

The jury found appellant guilty of both counts. The jury assessed punishment at life imprisonment on the continuous sexual abuse count and 20 years' imprisonment on the indecency count.

Appellant appealed the resulting judgments.

## II.  ANALYSIS

### A.    Issues One and Two:  Did the trial court err by admitting Richardson's and Brandi Taylor's outcry testimony?

Appellant's first issue argues that the trial court erred by allowing Richardson to testify to J.E.'s outcry because the outcry statements were too vague. Appellant's second issue argues that

the trial court erred by allowing Brandi Taylor to testify to (i) J.E.'s outcry statement to her because the statement was too vague and (ii) J.E.'s later description of appellant's conduct to a police officer that Brandi merely overheard.

The State argues that appellant failed to preserve error and that the evidence was properly admitted in any event.

For the following reasons, we conclude that appellant did not preserve certain arguments and reject his remaining arguments.

### 1. Error Preservation

"Preservation of error is a systemic requirement on appeal." *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009) (footnote omitted). If an issue has not been preserved for appeal, we should not address it. *Id.*

We conclude that appellant did not preserve any complaints about Brandi's testimony. Richardson and Brandi both testified in a hearing outside the jury's presence to determine their outcry testimony's admissibility. At the hearing's end, appellant's counsel objected as follows:

> Your Honor, I would request the State that they identify one outcry witness. I think with regard to Ms. Richardson's statements with regard to time, content, and circumstantial liability of the statements, she cannot pinpoint where any of these allegations occurred, and I hereby request that Ms. Richardson be stricken as an outcry witness.

Thus, appellant did not specifically object to Brandi's outcry testimony during the sub rosa hearing. Nor did appellant later object to Brandi's outcry testimony before the jury. We conclude that appellant did not preserve the asserted error as to Brandi's outcry testimony.

We next address appellant's complaint that Richardson's outcry testimony was too vague to be admissible.

## 2.      Richardson's Testimony

Texas Code of Criminal Procedure article 38.072 makes certain outcry statements by certain abuse victims admissible despite the hearsay rule. *See* TEX. CODE CRIM. PROC. art. 38.072; *Kirvin v. State*, No. 05-13-00332-CR, 2014 WL 4261237, at *2 (Tex. App.—Dallas Aug. 28, 2014, no pet.) (mem. op., not designated for publication). The outcry witness is the first person over the age of 18, other than the defendant, to whom the victim spoke about the offense.[2] CRIM. PROC. art. 38.071, § 2(a)(3).

To be an admissible outcry statement, the victim's statement must describe the alleged offense in some discernable way that is event specific rather than person specific, and that is "'more than words which give a general allusion that something in the area of child abuse is going on.'" *Lopez v. State*, 343 S.W.3d 137, 140 (Tex. Crim. App. 2011) (quoting *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990)).

The trial court has broad discretion in determining whether a witness is a proper outcry witness, and its determination will not be disturbed absent an abuse of discretion. *Sims v. State*, 12 S.W.3d 499, 500 (Tex. App.—Dallas 1999, pet. ref'd).

During the outcry witness hearing, Richardson testified that J.E. made an outcry statement to her in roughly August 2011. She and J.E. were having a conversation while they were tending to the family's goats. Richardson said, "She told me that she was asleep in her tent, and, Timothy Taylor came in, and he cuddled up with her. And then he had touched her in her genital areas." Richardson also testified that J.E. said that she pretended to be asleep so appellant would not know she was awake.

We hold that the trial court did not abuse its discretion by concluding that J.E.'s outcry statement was specific enough to be admissible. The statement was not a general allusion to

---

[2] We said in *Kirvin* that multiple outcry witnesses are permissible if they testify about different events. *Kirvin*, 2014 WL 4261237, at *2.

sexual abuse, but rather it conveyed (i) where J.E. was when appellant committed the act, (ii) when it happened, and (iii) the manner in which appellant abused her. J.E. also told Richardson how she reacted to the abuse—by pretending to be asleep. The trial court thus reasonably concluded that that outcry statement was specific enough to satisfy article 38.072. *See Creech v. State*, No. 05-09-00762-CR, 2011 WL 1663040, at *4 (Tex. App.—Dallas May 4, 2011, pet. ref'd) (not designated for publication) (trial court did not err by allowing testimony that the victim told the witness that appellant "touched and kissed her breasts and 'ginee' in the bathroom in his home in Allen and at the natatorium" (footnote omitted)).

For the foregoing reasons, we overrule appellant's first two issues.

**B.      Issue Three:  Did the trial court commit harmful error by allowing a detective to testify about appellant's credibility during an interview?**

Appellant's third issue argues that the trial court erred by overruling his objections to a detective's testimony that she had a feeling appellant was hiding things from her and that she could see in his eyes that he was lying.

The State responds that appellant did not preserve error. The State further responds that if error was preserved, any error was harmless.

For the following reasons, we conclude that (i) appellant did not preserve error as to all of Jackson's testimony and (ii) admitting the part of Jackson's testimony that appellant successfully objected to was harmless error, assuming it was error at all.

**1.      Error Preservation**

This issue concerns testimony by Detective Phyllis Jackson, who interviewed appellant at the Children's Advocacy Center after Brandi had taken J.E. and the other children there. The testimony came in during the State's direct examination. We include the relevant testimony, objections, and rulings in full:

Q.      As an investigator and interviewing thousands of these types of cases—
        investigating thousands of these types of cases, interviewing witnesses,
        victims, suspects, do you develop in your mind an idea about how people
        are responding to your questions?  Do you get some sort of hunch,
        detective's feeling?  Do you get anything like that?

A.      It varies.  But sometimes, yes, sir.

Q.      Did anything, from this defendant in your interview with him, give you
        that type of feeling, or was it you don't know?

[Defense]: Your Honor, I'm going to object to that line of questioning.

The Court: What's your legal objection?

[Defense]: It calls for speculation what the defendant—what his demeanor was
        with regard to answering the questions.  I don't think she's qualified to
        sit down and give expert testimony.

The Court: Overruled.

A.      Can you ask me the question one more time?

Q.      It was so artfully asked the first time.  I'm sure.  In talking with this
        defendant, did you get a gut feeling?  Did you get a hunch?  Based on your
        years of experience and training, did you think he was being deceitful with
        you?  Did you think that he was trying to hide things from you?  Did you
        get any feeling like that?

A.      Yes, sir.  I did.

Q.      Can you tell the jury what it is about talking with him the things that he
        said and did that made you think that?

A.      Some of the things were, he would preface it, or end statements with
        "Honest to God".  "I'm telling the truth."  "Honestly."  And then, at one
        point in my interview, I looked at him and told him I saw it in his eyes that
        he was holding something back from me.

[Defense]: Your Honor, I'm going to object to this line of answering.  I don't
        believe that she's qualified to sit down to determine deception or
        truthfulness on behalf of any witness.

The Court: Overruled.  Ask your next question, though, Mr. Lewis.

Q.      You said you would say something like, I can see it in your eyes?

A.      Yes, sir.  I did.

–10–

Q.     And I think there are other—are there other types of phrases or ways in questioning a suspect that are deceitful in nature, or you're trying to be different in the way you're asking the questions? Did you really see something in his eyes?

A.     I really did. Yes, sir.

Q.     You thought—

[Defense]: Your Honor, I'm going to object under 702—

The Court: Sustained.

After the court sustained appellant's last objection, the examination moved on to other topics.

Error preservation generally requires a timely objection and a trial court ruling. *See* TEX. R. APP. P. 33.1(a). If a question clearly calls for an objectionable response, the opposing party must either object before the witness answers or show some legitimate reason for delaying until after the answer is given. *Dinkins v. State*, 894 S.W.2d 330, 355 (Tex. Crim. App. 1995). If a post-answer objection is permissible, the objecting party must pursue the matter to an adverse ruling—if the objection is sustained, he must request an instruction to disregard, and if the instruction is given, he must move for mistrial. *See Camp v. State*, No. 05-00-01963-CR, 2002 WL 31567767, at *4 (Tex. App.—Dallas Nov. 20, 2002, pet. ref'd) (not designated for publication) (citing *Fuller v. State*, 827 S.W.2d 919, 926 (Tex. Crim. App. 1992)); *see also Smith v. State*, No. 05-09-01478-CR, 2011 WL 477917, at *3 (Tex. App.—Dallas Feb. 11, 2011, pet. ref'd) (not designated for publication) (party whose objection was sustained and who did not request jury instruction or mistrial failed to preserve error).

Appellant's first objection was overruled, but the objection did not preserve any error because the witness did not then answer the question appellant objected to. That question was essentially whether Jackson got a "hunch" or a "detective's feeling" when she interviewed appellant. After the court overruled appellant's objection, Jackson asked for the question to be repeated. The State did not repeat the question but rather asked a series of five distinct

questions, the last of which was essentially whether Jackson got the feeling during the interview that appellant was being deceitful or trying to hide things from her. This was different from the State's original question, which was simply whether Jackson got any kind of hunch or intuition about appellant at all. Because the question was different, appellant had to object again. *See generally* TEX. R. APP. P. 33.1(a). Appellant did not object to the new question, and Jackson answered that she got the feeling that appellant was being deceitful with her or was trying to hide things from her. No error was at that point preserved regarding that answer.

Appellant did preserve error as to Jackson's next answer. The State asked, "Can you tell the jury what it is about talking with him the things that he said and did that made you think that [appellant was being deceitful or trying to hide things]?" Jackson responded, "Some of the things were, he would preface it, or end statements with 'Honest to God'. 'I'm telling the truth.' 'Honestly.' And then, at one point in my interview, I looked at him and told him I saw it in his eyes that he was holding something back from me." Appellant then objected to Jackson's qualifications to determine a witness's deception or truthfulness, and the trial court overruled the objection. Although appellant's objection came after Jackson had answered, the objection was timely as to the last sentence of Jackson's answer because it was not clear that the State's question called for Jackson to testify that she could tell appellant was holding something back in the interview.

Appellant did not preserve any error thereafter. He did not object to the State's next question, "You said you would say something like, I can see it in your eyes?" Jackson answered, "Yes, sir. I did." Then the State asked a double question, "[A]re there other types of phrases or ways in questioning a suspect that are deceitful in nature, or you're trying to be different in the way you're asking the questions? Did you really see something in his eyes?" Jackson answered, "I really did. Yes, sir." Although appellant then objected under evidence rule 702, and the trial

–12–

court sustained the objection, appellant did not preserve any error because he did not ask for an instruction to disregard or a mistrial. *See Smith*, 2011 WL 477917, at *3 (party whose objection was sustained and who did not request jury instruction or mistrial failed to preserve error).

For these reasons, we conclude that appellant preserved error as to only one part of Jackson's testimony, namely her statement, "And then, at one point in my interview, I looked at him and told him I saw it in his eyes that he was holding something back from me."

## 2. Harm

It is generally improper for a witness to offer a direct opinion as to another witness's truthfulness. *Blackwell v. State*, 193 S.W.3d 1, 21 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd); *Fisher v. State*, 121 S.W.3d 38, 40 (Tex. App.—San Antonio 2003, pet. ref'd). This rule applies to expert and lay witness testimony alike. *Blackwell*, 193 S.W.3d at 21.

Assuming that Jackson's statement, "And then, at one point in my interview, I looked at him and told him I saw it in his eyes that he was holding something back from me," ran afoul of the foregoing rules, we conclude nevertheless that the overruling of appellant's objection to the statement was harmless error.

We generally review the erroneous admission of evidence under the nonconstitutional error test found in Texas Rule of Appellate Procedure 44.2(b). *Trigo v. State*, No. 05-13-01668-CR, 2014 WL 7496595, at *2 (Tex. App.—Dallas Dec. 30, 2014, no pet.) (mem. op., not designated for publication). Nonconstitutional errors are harmful only if they affect substantial rights. TEX. R. APP. P. 44.2(b). An error affects a substantial right if it had a substantial and injurious effect or influence in determining a jury verdict. *Trigo*, 2014 WL 7496595, at *2. If improperly admitted evidence did not influence the jury or had only a slight effect on its deliberations, the error is harmless. *Id*. We may consider factors such as the strength of the evidence supporting the verdict, the character of the alleged error and how it might be considered

–13–

with other evidence in the case, the jury instructions, the State's theory, any defensive theories, the closing arguments, voir dire, and whether the State emphasized the evidence. *Id*.

We conclude that the error was harmless. With no physical evidence, the State's case turned on witness credibility. As a factor in analyzing whether the erroneous admission of witness truthfulness testimony would normally tend to suggest harm. *See Wiseman v. State*, 394 S.W.3d 582, 588 (Tex. App.—Dallas 2012, pet. ref'd) (finding erroneously admitted evidence harmful in part based on this factor). On the other hand, appellant did not preserve error as to similar evidence that the jury heard, such as Jackson's testimony that (i) she got the feeling appellant was being deceitful or trying to hide things from her and (ii) she saw something in appellant's eyes that he was holding something back. The only statement that appellant successfully objected to was so similar to these other statements that we cannot conclude it had any distinctive effect on the jury's deliberations. *See Villanueva v. State*, No. 05-14-01396-CR, 2016 WL 2609686, at *5 (Tex. App.—Dallas May 4, 2016, no pet.) (mem. op., not designated for publication) ("[E]rror in the admission of evidence may be rendered harmless when substantially the same evidence is admitted elsewhere without objection."). Moreover, the State did not mention Jackson's testimony about appellant during closing argument.

We conclude that the trial court's error, if any, probably did not affect appellant's substantial rights. Accordingly, we overrule appellant's third issue.

**C.     Issue Four:  Did the trial court err by allowing a forensic interviewer to testify about "grooming" over appellant's objection to her qualifications?**

Appellant's fourth issue argues that the trial court erred by overruling his objection that forensic interviewer Stacy Wendling was not qualified to testify about the phenomenon of "grooming."

The State responds that the trial court did not abuse its discretion.

For the following reasons, we agree with the State.

–14–

### 1. Applicable Law and Standard of Review

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. To be admissible, expert testimony must generally satisfy three criteria: (i) qualification, (ii) reliability, and (iii) relevance. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006).

Determining whether a witness is qualified as an expert involves a two-step process. First, the witness must have a sufficient background in a particular field. *Id*. Second, the witness's background must relate to the very matter about which the witness is to give an opinion. *Id*.

Courts may consider several factors in determining whether an expert is qualified. First, the field's complexity is relevant; more complex fields require more qualified experts. *See Rodgers v. State*, 205 S.W.3d 525, 528 (Tex. Crim. App. 2006). Second, the testimony's conclusiveness is relevant; DNA comparisons yielding almost conclusive results require more expertise than shoe–footprint comparisons. *Id*. And third, the issue's centrality to the case's resolution is relevant; more expertise is required, for example, if DNA evidence is the only evidence connecting the defendant to the crime than if eyewitnesses and a confession also make that connection. *Id*.

We review trial court rulings on expert qualifications for abuse of discretion. *See Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000). Because the possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness is qualified to testify as an expert in a particular case. *Rodgers*, 205 S.W.3d at 527–28. Appellate courts rarely disturb the trial court's determination. *Vela*, 209 S.W.3d at 136.

–15–

## 2. Application of the Law to the Facts

The subject matter in question here is "grooming," which refers to behaviors that child molesters commonly use to create compliant and trusting victims. *Morris v. State*, 361 S.W.3d 649, 666–67 (Tex. Crim. App. 2011). The *Morris* court held that the grooming phenomenon is an appropriate subject for expert testimony. *Id*. at 668. It also observed that experience with child sex abuse cases can give a person expertise about the grooming phenomenon. *Id*. at 666–67.

Appellant challenges witness Stacy Wendling's qualifications. Wendling testified that she had a sociology degree and a master's in social work. She had nine years' experience working at the Children's Advocacy Center. When she was hired, she did 40 hours of in-house training for forensic interviewing, and after that she participated in a variety of regional training programs. A forensic interview is a neutral fact-finding interview with a child who has been brought to the Center. At the time of trial, Wendling had conducted over a thousand forensic interviews.

Appellant objected to Wendling's qualifications when the State asked her what "grooming" means. The trial court sustained the objection. The State then elicited Wendling's testimony that she had been "trained in the dynamics between abusers and victims." She had also been trained "to look for certain behaviors between somebody who is an abuser and what goes on between them and somebody who they victimize." And she testified that "grooming" relates to the dynamic and the relationship between an abuser and a victim. The State then re-asked Wendling what "grooming" means, appellant repeated his objection, and the trial court overruled the objection. Wendling then explained that "[g]rooming is where somebody gets to know the child, has a relationship with the child and is with the child a lot to get that child's trust."

We conclude that the *Rodgers* factors do not support requiring a high threshold of expertise in this case. First, the concept of grooming is not complex. As a concurring opinion in *Morris* noted, "This is not rocket science." 361 S.W.3d at 670–71 (Cochran, J., concurring). Second, grooming behavior is not particularly conclusive of a person's guilt. Finally, whether appellant's observable conduct was consistent with grooming was not the central issue in the case, so the third *Rodgers* factor also does not demand a higher threshold of expertise. *See generally Bryant v. State*, 340 S.W.3d 1, 9–10 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (using a similar *Rodgers* analysis in a grooming expert case).

Wendling testified that she had conducted over a thousand forensic interviews. Context supports an inference that these interviews involved children who were suspected victims of abuse or neglect. She also testified that she had been trained in abuser–victim dynamics and that she had been trained to look for certain behaviors by abusers and their victims. Finally, she testified that grooming relates to the dynamic and the relationship between an abuser and a victim. Under the *Rodgers* factors, the State did not have to show heightened expertise or training for Wendling to testify about grooming. We conclude that the trial court did not abuse its discretion by admitting Wendling's testimony.

We overrule appellant's fourth issue.

**D.      Issue Five:  Is the judgment reversible based on the cumulative error doctrine?**

Appellant's fifth issue argues that the trial court's errors' cumulative effect rendered his trial fundamentally unfair. The State responds that appellant has shown no error, so the cumulative error doctrine cannot apply.

"The doctrine of cumulative error provides that the cumulative effect of several errors can, in the aggregate, constitute reversible error, even though no single instance of error would." *Holloway v. State*, No. 05-14-01244-CR, 2016 WL 3098297, at *4 (Tex. App.—Dallas May 25,

2016, no pet.) (mem. op., not designated for publication). In a cumulative error analysis, we consider only errors that were preserved for appeal. *See Logan v. State*, No 07-09-00150-CR, 2010 WL 2010921, at *6 (Tex. App.—Amarillo May 20, 2010, pet. ref'd) (mem. op., not designated for publication).

Our analysis of appellant's other issues shows only one arguable error that was preserved, the admission of certain credibility testimony by Detective Jackson, and we concluded that this arguable error was harmless. Thus, there are no errors to cumulate.

We overrule appellant's fifth issue.

**E.  Issue Six:  Did the State commit prosecutorial misconduct rising to the level of fundamental error by making improper jury arguments, using false testimony, and posing improper questions to a witness?**

Appellant's sixth issue argues that the State violated his right to a fair trial by prosecutorial misconduct in (i) four alleged instances of improper closing argument, (ii) one allegation that the State used false testimony to secure appellant's conviction, and (iii) one allegation that the State posed improper questions to a witness.

Appellant acknowledges that he did not raise prosecutorial misconduct in the trial court. Prosecutorial misconduct generally must be preserved in the trial court. *See Penry v. State*, 903 S.W.2d 715, 764 (Tex. Crim. App. 1995) (per curiam) ("The proper method of preserving error in cases of prosecutorial misconduct is to (1) object on specific grounds, (2) request an instruction that the jury disregard the comment, and (3) move for a mistrial."). Nevertheless, appellant argues that this case presents prosecutorial misconduct rising to the level of fundamental error. *See* TEX. R. EVID. 103(e) ("In criminal cases, a court may take notice of a fundamental error affecting a substantial right, even if the claim of error was not properly preserved."); *Clark v. State*, 365 S.W.3d 333, 340 (Tex. Crim. App. 2012) (citing Supreme Court authority that fundamental error occurs when certain constitutional rights are violated, "such as

–18–

the right to counsel, the right to an impartial judge, the right for there not to be unlawful exclusion of members of the defendant's race from the grand jury, the right to self-representation at trial, or the right to a public trial").

For the following reasons, we overrule appellant's sixth issue.

### 1.     Vouching for J.E.'s Credibility

First, appellant argues that a prosecutor improperly vouched for J.E.'s credibility during closing argument by expressing her own opinion of J.E.'s credibility. We disagree.

Permissible jury argument usually falls into one of four categories: (i) summation of the evidence, (ii) reasonable deductions from the evidence, (iii) answers to opposing counsel's argument, and (iv) pleas for law enforcement. *Davis v. State*, 329 S.W.3d 798, 821 (Tex. Crim. App. 2010). A prosecutor may not inject his or her personal opinion of a witness's credibility during closing argument. *Menefee v. State*, 614 S.W.2d 167, 168 (Tex. Crim. App. 1981). But the prosecutor may argue that a witness's testimony is true as long as the argument is based on the evidence and reasonable deductions from it. *Hinojosa v. State*, 433 S.W.3d 742, 763 (Tex. App.—San Antonio 2014, pet. ref'd).

Appellant focuses on the State's closing argument that J.E. was credible because her story was consistent when she told it to various people, including the prosecutors in this case. The prosecutor argued:

> When she told Esther, it was 2011. When she told Brandi it was 2011 going on 2012. She told the police in 2012. She told the forensic interviewer at the Collin County Children's Advocacy Center. She told the SANE nurse. She told me. She told Mr. Lewis [the other prosecutor on the case].[3] And she told the twelve of you here yesterday. The same story that she's been telling the entire time.

---

[3] J.E. testified that the two prosecutors in this case were among the people she had to talk to after she made her outcry to Brandi Taylor.

Appellant points out that the State went on to argue that "[i]f she were not telling the truth, that story probably would have deteriorated and changed over time, but she's lived it. She can relate it. She can stay consistent on the details, and she was consistent on the details."

The State argued that J.E. was a credible witness as a deduction from evidence showing that J.E.'s story was consistent over time—not based on the prosecutor's personal opinion about J.E.'s trustworthiness. This was proper, so it necessarily follows that the argument was not fundamental error. *See id.*

### 2. Relying on and Arguing False Testimony

Appellant's next argument focuses on a discrepancy in the evidence and on the State's related closing argument.

Esther Richardson testified that in August 2011 J.E. told her that appellant had touched her private areas. J.E., however, testified that Richardson asked her one time if anything had happened, and J.E. told her no. J.E. further testified that she eventually told Richardson that she had lied, but that this happened after J.E. moved in with her aunt Brandi, which happened after Christmas 2011. In rebuttal closing argument, the State did not attempt to explain the discrepancy but instead focused solely on J.E.'s version of events in the course of arguing that J.E.'s story was consistent:

> When [J.E.] first talked to Esther, she says I lied to Esther. I told Esther it didn't happen. Now, [defense counsel] may forget that [J.E.] also testified, After that I did tell Esther. I did tell Esther it did happen. I told her a little bit.

The State's use of material false evidence to procure a conviction violates the defendant's constitutional due process rights. *Ex parte De La Cruz*, 466 S.W.3d 855, 866 (Tex. Crim. App. 2015). To determine whether a particular piece of evidence has been shown to be false, the court inquires whether the testimony, taken as a whole, gives the jury a false impression. *Id.* Here, the jury was not given a false impression—it heard both witnesses' testimony, and it was fully aware

–20–

that Richardson's and J.E.'s testimony conflicted on certain details. The *De La Cruz* court favorably cited Fifth Circuit precedent for the premise that conflicting trial testimony merely creates a credibility question for the jury and does not establish the falsity of testimony. *Id.* at 871 (citing *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990)). That is the situation in this case. We conclude there is no fundamental error here.

We also conclude that the State's closing argument did not constitute fundamental error. During closing, appellant's counsel pointed out the discrepancy between Richardson's testimony and J.E.'s testimony. In rebuttal, the State made the argument quoted above, in which it emphasized only J.E.'s testimony on the disputed issue. The State's argument was both a summation of the evidence and a response to appellant's argument. We conclude that the State's argument was not fundamental error.

### 3. Other Incidents

Appellant raises three other incidents that he asserts constitute prosecutorial misconduct. Two involve closing argument. The other involves the State's questions to witness Jackson about appellant's credibility.

In rebuttal closing argument, the State argued that "[appellant] knows that [J.E.] is aware that he bought Dannie a subscription to Playboy." The State made this assertion during a broader argument that appellant engaged in many forms of inappropriate conduct around J.E. Appellant argues, and the State concedes, that the assertion about *Playboy* magazine misstated appellant's testimony, which was actually that (i) Dannie had a subscription to *Playboy* when they lived in Canton, (ii) appellant knew that J.E. knew that Dannie had the subscription, and (iii) appellant never showed the magazine to J.E. or looked at it with the children. The evidence did not show that appellant bought Dannie the subscription or that J.E. was aware of such a fact. But we conclude that this factual misstatement was relatively minor and did not rise to the level of

fundamental error. *Cf. Dorsey v. State*, No. 2-01-236-CR, 2003 WL 1354134, at *7–8 (Tex. App.—Fort Worth Mar. 20, 2003, no pet.) (not designated for publication) (State's factual misstatement during closing argument was objectionable but did not entitle defendant to a mistrial).

Next, appellant complains about the following passage during the State's rebuttal argument:

> [Appellant] says on that video that they have open, free discussions about sex in this family. What is he doing? He's breaking down those boundaries. He's grooming her to believe that it's acceptable.

He argues that no evidence supported the argument. We disagree. Stacy Wendling testified that a stepfather's having open discussions with adolescent children about the parents' sex life would possibly be an example of breaking down boundaries. The State's argument was not fundamental error.

Finally, appellant argues that the State's questions to witness Phyllis Jackson about appellant's credibility, quoted in Part II.B.1 *supra*, rose to the level of fundamental error. He relies on *Rogers v. State*, in which the court of appeals reversed the defendant's conviction based on the prosecutor's flagrant and repeated improper questions to the defendant and his character witnesses, despite the defendant's failure to object. *Rogers v. State*, 725 S.W.2d 350, 351–61 (Tex. App.—Houston [1st Dist.] 1987, no pet.). The *Rogers* court said,

> Where there is serious and continuing prosecutorial misconduct that undermines the reliability of the factfinding process or, even worse, transforms the trial into a farce and mockery of justice, as occurred here, resulting in deprivation of fundamental fairness and due process of law, the defendant is entitled to a new trial even though few objections have been perfected.

*Id.* at 359–60 (emphasis omitted). In this case, although the State's questions to Jackson about appellant's credibility were improper, they were relatively few in number, and the State moved on when the trial court sustained appellant's Rule 702 objection. The misconduct here was not

comparable to the flagrant and repeated misconduct in *Rogers* and did not deny appellant fundamental fairness or due process.  *See Johnson v. State*, 432 S.W.3d 552, 562 (Tex. App.—Texarkana 2014, pet. ref'd) (distinguishing *Rogers* on similar grounds).  Accordingly, there is no fundamental error, and appellant forfeited appellate review by failing to object based on prosecutorial misconduct.  *See id.*

### III.  CONCLUSION

For the foregoing reasons, we affirm the trial court's judgments.


/Bill Whitehill/
BILL WHITEHILL
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
140821F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

TIMOTHY JAMES TAYLOR, Appellant

No. 05-14-00821-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 366th Judicial District Court, Collin County, Texas
Trial Court Cause No. 366-80945-2012.
Opinion delivered by Justice Whitehill.
Justices Bridges and Evans participating.

      Based on the Court's opinion of this date, the judgments of the trial court are **AFFIRMED**.

Judgment entered December 27, 2016.