ACCEPTED
01-17-00506-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
3/22/2018 4:56 PM
CHRISTOPHER PRINE
CLERK

# COURT OF APPEALS
## FIRST SUPREME JUDICIAL DISTRICT
### Houston, Texas

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

3/22/2018 4:56:14 PM

CHRISTOPHER A. PRINE
Clerk

| | | |
|---|---|---|
| JUSTIN JAMES FORSYTH, | § | |
| APPELLANT | § | |
| | § | |
| VS. | § | NUMBER 01-17-00506-CR |
| | § | |
| | § | |
| THE STATE OF TEXAS, | § | |
| APPELLEE | | |

## APPELLANT'S BRIEF SPECIFYING ERROR OF WHICH APPELLANT COMPLAINS ON APPEAL

### APPEALED FROM THE 56TH JUDICIAL DISTRICT COURT OF GALVESTON COUNTY, TEXAS IN CAUSE NUMBER 16CR1930

### ORAL ARGUMENTS ARE REQUESTED

Winifred Weber
2525 Bay Area Blvd.
Suite 310
Houston, Texas 77058
SBN   01672500
Telephone:  (281)488-9040
Facsimile:   (281)488-9009

ATTORNEY FOR APPELLANT

# IDENTITY OF PARTIES AND COUNSEL

**For Justin James Forsyth, APPELLANT:**

Trial counsel:
Paul H. Lavalle
Attorney at Law
SBOT NO. 11998625
2501 Palmer Highway, Suite 112
Texas City, Texas 77590
Telephone:  (409) 945-3414

Appellate counsel:
Winifred Weber
2525 Bay Area Blvd., Suite 310
Houston, Texas 77058
SBN   01672500
Telephone:  (281)488-9040
Facsimile:    (281)488-9009

**For the State of Texas, APPELLEE:**

Jack Roady
Criminal District Attorney
Galveston County Justice Center
600 59th Street, Suite 3305
Galveston, Texas 77511
(409) 766-2355 phone
(409) 766-2290 fax

Trial Assistants:
Mrs. Kayla Allen
SBOT NO. 24043530
Mrs. Kacey Launius
SBOT NO.  24081188

Appellate Assistant:
Rebecca Klaren

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ................................................. ii

CITATIONS TO THE RECORD .................................................... iv

TABLE OF AUTHORITIES .................................................... iv

STATEMENT OF THE CASE ................................................... vi

STATEMENT REGARDING ORAL ARGUMENT ................................ vii

ISSUE ONE .................................................................. vii

ISSUE TWO .................................................................. vii

POINT OF ERROR ONE ...................................................... 2

    RELEVANT FACTS ...................................................... 2

    SUMMARY OF THE ARGUMENT .......................................... 3

    ARGUMENT AND AUTHORITIES ......................................... 4

POINT OF ERROR TWO ..................................................... 13

    RELEVANT FACTS ..................................................... 13

    SUMMARY OF THE ARGUMENT .......................................... 15

    ARGUMENT AND AUTHORITIES ......................................... 15

PRAYER ...................................................................... 33

CERTIFICATE OF COMPLIANCE ........................................... 34

CERTIFICATE OF SERVICE ................................................. 34

# CITATIONS TO THE RECORD

The following abbreviation will be used to cite the record:

**TR.** refers to the clerk's transcript.

**V.** refers to the volume of the court reporter's statement of facts where the evidence referred to may be found.

**p.** refers to the page or pages where the cited material may be found.

**l.** refers to the line or lines where the cited material may be found.

# TABLE OF AUTHORITIES

**Cases**

*Bautista v. State*, 363 S.W.3d 259, 263 (Tex. App.-San Antonio 2012, no pet.) ............................................................................... 17

*Burks v. United States*, 437 U.S. 1, 11, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) 13

*Daniel v. State*, 577 S.W.2d 231, 234 TexCrimApp, reh denied June 7, 1978 ............................................................................ 5, 7, 8

*Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014) ...................... 4

*Hall v. State*, 86 S.W.3d 235, 240 (Tex.App.-Austin, Jul 26, 2002) .............. 4

*House v. State*, 947 S.W.2d 251 (Tex. Crim. App. 1997) (en banc) ............ 26

*Issa v. State*, 826 S.W.2d 159, 161 (Tex. Crim. App. 1992) ........................ 19

*Jackson v. Virginia*, 443 U.S. at 317–20, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979) ......................................................................... 13

*Murray v. State*, 457 S.W.3d 446, 448 (Tex.Crim.App.), *cert. denied,* 136 S.Ct. 198 (2015) ................................................................................ 5

*Parham v. Wilbon*, 746 S.W.2d 347 (Tex.App.--Fort Worth 1988, no writ) 28

*Penry v. State*, 903 S.W.2d 715, 764 (Tex. Crim. App. 1995) ..................... 16

*Robbins v. State*, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986) ................. 10

*Rogers v. State*, 725 S.W.2d 350, 360 (Tex. App. –Houston [1st Dist.] 1987, no pet.) .................................................................................... 17, 33

*Westbrook v. State*, 28 S.W.3d 772, 778 (Tex.Crim.App.2007) .................... 4

**Statutes**

TEX. PENAL CODE ANN. §49.08(a) (West 2003) ...................................... 5

TEX. PENAL CODE ANN. §6.04 (a) (West 2011) ...................................... 9

TEX. R. EVID. 607 ............................................................................ 30

TEX. R. EVID. 609(a) (1) ................................................................... 32

Tex.R. Evid. 614 .............................................................................. 28

Texas Constitution, Article 1, Section 19 ............................................ 16

Texas Disciplinary Rules of Professional Conduct 3.08 (a) (2016) ............. 27

United States Constitution Amendment XIV ......................................... 16

United States Constitution, Amendment V ........................................... 16

## STATEMENT OF THE CASE

On June 12, 2017, Appellant was arraigned for the offense of Intoxication Manslaughter, to which he entered a plea of "not guilty". V. 6, p. 1, ll 13-17; p. 4, ll 17-25; p. 5, ll 2-25: p. 6, ll 1-12. A jury of twelve and one alternate was empaneled the same day. V. 6, p 116, ll 12-21; p. 117, ll 2-9. On June 15, 2017, after hearing evidence and argument from both the State and Defense, the jury convicted Appellant as charged and further made an affirmative finding as to a deadly weapon. V. 9, p. 1, ll 13-17; p. 250, ll 19-24V. 9.

The jury heard punishment evidence and arguments from both Appellant and the State on June 16, 2017. V. 10, p. 1, 13-17. In a unanimous verdict, Appellant was assessed fifteen, (15), years confinement in the Texas Department of Criminal Justice, Institutional Division and a ten-thousand dollar, ($10,000.00), fine. V. 10, p. 62, ll 21-25; p. 63, ll 1-4.

The trial court signed a Certification of Appellant's Right of Appeal, certifying that this is not a plea bargain case, and that Appellant has the right to an appeal. TR, 343; Tex. Rule App. Proc. 25.2(a)(2). On June 16, 2017, Appellant filed a timely notice of appeal, thus perfecting this appeal. TR, 346; Tex. Rule App. Proc. 26.2(a). As a result, this case is properly before this Court.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Texas Rules of Appellate Procedure 39.1 and 39.2, Appellant does not request oral argument before this Court of Appeals. Although this is a meritorious appeal of a criminal case, Appellant believes that the facts and legal arguments are adequately presented in this Brief and in the record. Appellant also believes that the decisional process of the Court of Appeals will not be significantly aided by oral argument. As a result, Appellant does not request oral argument and asks that the issues presented in this Brief be considered by this Court of Appeals by submission only.

## ISSUE ONE

**POINT OF ERROR ONE: THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH THE NECESSARY ELEMENT OF APPELLANT'S INTOXICATION AS THE CAUSE OF DEATH.**

………………page 2

## ISSUE TWO

**POINT OF ERROR TWO: THE CUMULATIVE EFFECT OF PROSECUTORIAL MISCONDUCT DEPRIVED APPELLANT OF DUE PROCESS OF LAW AND DUE COURSE OF LAW.**

……………..page                                    13

COURT OF APPEALS
FIRST SUPREME JUDICIAL DISTRICT

Houston, Texas

JUSTIN JAMES FORSYTH,                 §
                        APPELLANT     §
                                      §
VS.                                   §        NUMBER 01-17-00506-CR
                                      §
                                      §
THE STATE OF TEXAS,                   §
                        APPELLEE

APPELLANT'S BRIEF SPECIFYING ERROR OF WHICH
APPELLANT COMPLAINS ON APPEAL
IN CAUSE NUMBER 16CR1930

APPEALED FROM THE 56th JUDICIAL DISTRICT COURT
OF GALVESTON COUNTY, TEXAS

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, JUSTIN JAMES FORSYTH, hereinafter referred to as the Appellant, and respectfully submits this his brief specifying error of which Appellant complains on appeal. Pursuant to the Texas Rules of Appellate Procedure, the Appellant would show through his attorney the following point of error of which he wishes to complain.

**POINT OF ERROR ONE**

**POINT OF ERROR ONE IS THAT THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH THE NECESSARY ELEMENT OF INTOXICATION AS THE CAUSE OF DEATH.**

**RELEVANT FACTS**

10th Street runs through a densely populated neighborhood in the Galveston Bay community of Bacliff, Texas. V. 7, p. 82, ll 19-22. A pot-holed, two-way street; its fringes crumble into the grass. V. 7, p. 94, ll 13-23; p. 95, ll 2-4. From edge to edge the street is roughly 19 feet wide. V. 9, p. 190, l 25; p. 191, ll 1-3. Flanked by ditches, there are no sidewalks and no lane markings. V. 7, p. 95, ll 5-8. Motorists travel into the opposing lane to side-step cars parked along the margin. V. 7, p. 95, ll 20-24.

On the Sunday evening of July 17, 2015, three 10th Street families were in their front yards enjoying the end of the day. V. 7, p. 15, l 25; p. 16, ll 1-3, 11-14. As they often did, six children, siblings and cousins, played in the street in front of their homes. V. 7, p. 18, ll 6-9. The children, aged 4 to 10 years, rode around on bicycles and scooters. V. 7, 18, ll 6-9.

A few doors down, at the corner of 10th and Jackson Road, three young men sat under the trees of their front yard. V. 7, p. 72, ll 11-19; p. 73, ll 2-3; p. 75, ll 17-25; p. 76, ll 9-17. Around 7 pm, Appellant crossed from Jackson

2

to 10th on his motorcycle.  V. 7, p. 76, ll 1-2.  The motorcycle engine revved and heads turned.  V. 7, p. 76, ll 18-25; p. 77, ll 1-5.

At the sound of the engine children scattered off the street, but the youngest, little Omar, didn't seem to notice the motorcycle travelling down the middle of 10th street about thirty miles an hour.  V. 7, p. 153, ll 3-6; V. 9, p. 190, ll 12-24.  Adriel Omar Hernandez, Omar, 4 years old, had picked up a black toy Tonka truck from his yard.  V. 7, p. 15, ll 16-20; p. 19, ll 19-21; p. 20, ll 7-9.  As the motorcycle passed his house, Omar rolled the Tonka truck onto the street and into the left side of the motorcycle.  V. 7, p. 154, ll 2-10; V. 8, p. 215, ll 2-6.  Momentum lifted Omar off the street and carried him with the motorcycle a few feet.  V. 8, p. 214, ll 11-15; p. 215, ll 2-10.  Appellant began to lay the motorcycle down and Omar's body dropped away.  V. 8, p. 214, ll 13-15.  The motorcycle continued off the right side of the road and came to a stop in the ditch.  V. 7, p. 90, ll 6-8.  Omar did not survive the night.  V. 7, p. 62, ll 23-25; p. 63, ll 1-2.

## SUMMARY OF THE ARGUMENT

The record as a whole does not support the necessary element that intoxication caused Appellant and Adriel Omar Hernandez, Omar, to collide, resulting in Omar's death.  Contrary to the State's argument that Omar died because an intoxicated condition caused Appellant to drive on the wrong

3

side of the street, the record shows that Appellant drove to the center or slightly left of center because Appellant was taking evasive action to protect several children who were playing in the street.

## ARGUMENT AND AUTHORITIES

Evidence is legally insufficient if, reviewing the evidence in a light most favorable to the verdict, a rational trier of fact could not have found the essential elements of the offense beyond a reasonable doubt. *Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781–89, 61 L.Ed2d 560 (1979)). It rests on the jury alone to judge the credibility and weight of witness testimony. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). The reviewing court will presume that the fact finder resolved any conflicting testimony in favor of the verdict. *Id.* The reviewing court may consider direct or circumstantial evidence and may draw reasonable inferences from that evidence. *Westbrook v. State*, 28 S.W.3d 772, 778 (Tex.Crim.App.2007). However, the proof must generate more than a strong suspicion or even a probability. *Hall v. State*, 86 S.W.3d 235, 240 (Tex.App.-Austin, Jul 26, 2002). The question for the reviewing court is whether inferences necessary to support an essential element are reasonable based on the cumulative force of the evidence when viewed in the light most

favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex.Crim.App.), *cert. denied,* 136 S.Ct. 198 (2015).

The State has the burden to prove each element of an offense. Texas Code Crim. Proc. Ann. art. 38.03 (West Supp. 2011); *Alvarado v. State*, 912 S.W.2d 199, 206-07 (Tex. Crim. App. 1995). The offense of intoxication manslaughter requires that a person (1) operates a motor vehicle in a public place, (2) while intoxicated, and (3) by reason of that intoxication, causes the death of another person by accident or mistake. TEX. PENAL CODE ANN. §49.08(a) (West 2003). It is not enough to prove an intoxicated defendant caused a death while operating a motor vehicle in a public place, the statute requires the State to prove that it was the defendant's condition of intoxication that actually caused the death. *Daniel v. State*, 577 S.W.2d 231, 234 TexCrimApp, reh denied June 7, 1978.

At Appellant's trial, witnesses testified that Appellant was driving in the middle, or slightly on the wrong side of the unmarked street, (the left side of 10th Street), toward Avenue A. V. 7, p. 95, ll 5-8; p. 62, ll 6-15; V. 8, 203, ll 8-16. The State asserted that (1) the reason Appellant was driving on the wrong side of the street was because Appellant was intoxicated and that (2) Omar would not have died had Appellant been driving on the proper side.

5

The evidence shows however, that Appellant was purposefully driving in a manner to avoid children who were playing in the street.

According to testimony at Appellant's trial, Appellant travelled down 10th Street at roughly 30 miles per hour. V. 9, p. 190, ll 19-24. Appellant, seeing the group of older children playing in the street, revved his motorcycle engine to warn them he was approaching. V. 9, p. 203, ll 7-13. Appellant chose the engine sound over the horn, because the horn only produced a dinky "meep, meep" sound and he believed the engine was a more effective warning. V. 9, p. 202, ll 11-25; p. 203, ll 1-13. In fact, Appellant was right. As Appellant made his way down the middle, or slightly on the left, (east), side of 10th street, four children on the street heeded the warning sound, and moved off to the right, (west), side, into Omar's yard. V. 7, p. 86, ll 8-11; p. 105, ll 20-23; p. 112, ll 6-14; p. 152, ll 7-15; p. 164, ll 8-15; p. 168, ll 8-15; V. 9, p. 202, ll 5-17; p. 203, ll 21-25; p. 214, l 1.

Maria Vasquez, Omar's great aunt, testified that, as Appellant passed through, little Omar, who was only 41 inches tall, (a little less than 3.5 feet), and weighed only 42 pounds, bent over his black Tonka truck and rolled it up out of the ditch from the left, (east), side of the road out to the middle, travelling west and into Appellant's motorcycle. V. 7, p. 153, 2-3; p. 156, ll 4-12; p. 162 ll 9-22; V. 12, p. 128. Vazquez testified that she never expected

6

Omar to go into the street; that Omar ran out into the street very fast and it happened so fast.  V. 7, p. 154, ll 2-6; p. 162, ll 9-22.

Vasquez, the only eye witness, testified that Appellant was driving down the middle of the street and Vasquez could not determine whether Appellant were driving more to one side than the other.  V. 7, p. 162, ll 6-15.  The State's accident reconstructionist testified that it appeared the impact happened about 8 feet from the left, (east), side of the road.  V. 8, p. 204, ll 15-17; p. 205, ll 11-13.  By that testimony, the impact would have occurred about 18 inches to the left, (east), of the center of 10th Street.

*Daniel v. State* presents a set of facts in which the Court of Criminal Appeals found sufficient evidence that the appellant's condition of intoxication caused a death.  *Id*.  In *Daniel*, the intoxicated appellant came upon a two-car wreck partially blocking a lighted road.  *Id* at 233.  (The night was dark and the car blocking the roadway had no lights.  However, a law enforcement officer standing in the road held a flashlight, and the area was illuminated by a blinking yellow light and a street light.  *Id*.)  Even though it was 9pm., there was evidence the appellant's headlights were off as he drove upon the two wrecked cars.  *Id.*  Driving 30 miles per hour, the appellant noticed one of the wrecked cars and tentatively braked, resulting in over 80 feet of medium grade skid marks.  *Id* at 234.  Disastrously, the

appellant failed to notice a very large, grown man standing in the middle of the road. The appellant struck and killed the man who was 5'11'' tall and weighed 460 pounds. *Id* at 234. Even upon striking and killing the man, the appellant did not realize he hit a person. *Id*.

The reviewing court in *Daniel* found that evidence was sufficient to support the necessary element that the appellant's intoxication caused the man's death in that (1) medium as opposed to heavy grade skid marks suggested the appellant did not appreciate the dire situation as would a non-intoxicated person under the same circumstances; (2) the appellant was driving without lights at 9pm; and, (3) that even though the appellant was driving only 30 miles per hour, he never saw the very large man standing in front of him. *Id*.

Like *Daniel*, in the instant case, Appellant never saw the person he struck before impact. V. 9, p. 204, ll 9-11. Unlike the decedent in *Daniel*, little Omar was not standing on the unmarked street at all until the critical moment Appellant attempted to drive through. Appellant was focused on four older, and one can logically infer larger, children aged 5-10 years, riding bikes on the right, (west), side of 10th Street. V. 7, p. 18, ll 6-9; V. 8, p. 203, ll 8-16. As Appellant drove south down 10th street, Omar and Omar's seven year old cousin played in a yard off the left, (east), side of

10th, across the street from Omar's house. V. 7, p. 152, ll 22-23; p. 153, ll 2-3; p. 164, ll 8-15, 24-25; p. 165, ll 1-2, 23-25; p. 166, l 1.

The State's assertion that Appellant drove on the wrong side of the street because he was intoxicated, cannot be reasonably inferred from the facts. First, at the time Appellant headed down the street, Omar was not on the street at all and therefore there was no reason for Appellant to look left. Appellant's attention was logically drawn to the right, (west), side of 10th street upon which the older children were playing. According to the State's witnesses, Appellant drove down the middle, and perhaps 18 inches into the left, (east), side of the street. The only reasonable conclusion is that Appellant took evasive action to protect the children playing in the street.

Omar was 41 inches tall, (a little less than 3.5 feet). V. 12, p. 128. That means he was near the height of an average motorcycle seat, had he been standing tall. But, Omar was not standing tall. Omar was bent over his Tonka truck rolling onto 10th Street and into Appellant. Unlike *Daniel*, the facts in the instant case do not support intoxication as causation.

The Texas Penal Code holds someone criminally responsible only where the result would not have occurred but for his conduct. TEX. PENAL CODE ANN. §6.04 (a) (West 2011). The statute requires that when concurrent causes exist, either (1) the accused's conduct must be sufficient

by itself to have caused the harm, or (2) the accused's conduct coupled with another cause must be sufficient to have caused the harm. *Robbins v. State*, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986).

In regard to the case at hand, Appellant's conduct was not sufficient to have caused Omar's death. If there had been enough evidence to support a finding that it was a condition of intoxication that caused Appellant to drive on the wrong side of the road, the record does not support the notion that those few inches would have spared Omar's life. Omar ran into the front of the forward travelling motorcycle.

Ricardo Javier Palacios, Palacios Accident Reconstruction, Owner, testified that he was retired from 21 years of service with DPS, and former team leader of the district reconstruction team out of Corpus Christi. V. 9, p. 167, ll 10-11, 18-23. Palacios testified he had successfully completed all 6 of the reconstruction training courses offered by DPS; investigated a few thousand accidents as a DPS officer; had been involved in 500 accident reconstruction cases in private practice; and, had testified many times. V. 9, p. 167, ll 23-25; p. 168, ll 1-2; p. 169, ll 24-25; P. 170, ll 1-9. In Appellant's case, Palacios examined all of the evidence gathered by the State's witnesses and accident reconstructionist, including "the investigation prepared by the Sheriff's Office, videos of statements taken by the Sheriff's Office, scale

10

diagram, data points from the scale diagram, photographs taken at the scene, at the hospital both by patrol and by crime scene investigators". V. 9, p. 170, ll 13-20.

Under cross-examination at Appellant's trial, Palacios testified that if Appellant had been the few inches to the right, in the south bound side of travel, Omar, continuing his trajectory, could have run into the rear of the motorcycle, rather than the front.

> Q. Thank you. So would you also agree with me
> that even hypothetically, even if the defendant was
> traveling in the middle of this lane, that he would
> have driven right past that child and that collision
> would not have occurred?
>
> A. I don't know what the child is doing, ma'am. If
> the child is still coming towards the middle of the
> road, the child could have hit the rear part of the
> motorcycle. V. 9, p. 187, ll 8-16.

Palacios's testimony was consistent with all of the evidence. In fact, Omar was travelling very fast from east to west across the narrow Street according to the eye witness, his Aunt Maria Vasquez. Omar was racing his

Tonka truck across the road toward his house, where his mother waited, and never saw the danger into which he plunged.

At trial, the State suggested that Appellant would have turned the motorcycle and avoided Omar if intoxication had not slowed Appellant's reaction time. However, Appellant did not know that Omar was in the street because Omar was so small and ran out so quickly from the left. Palacios testified that based on the evidence, Appellant's reaction time was substantially better than normal reaction time. According to Palacios, the time it takes a normal person to perceive danger and then react, "perception reaction time", ranges between 1.5 seconds and a little over 2.0 seconds. V. 9, p. 177, ll 22-25; p. 178, ll 1-6. Palacios calculated Appellant's "perception reaction time" from Omar's impact with the motorcycle to Appellant's laying down the motorcycle to be less than 1.0 second. V. 9, p. 177, ll 19-24. Palacios' evaluation of the reconstruction revealed that Appellant had demonstrated a much quicker than average reaction time, characterizing it as "pretty darn good" and "excellent". V. 9, p. 177, ll 22-25; p. 177, ll 1-6.

The instant case concerns the death of a 4 year old child, and as such, it is heartbreaking. Human instinct presses to hold someone accountable for the loss. Where a person stands accused, there is a strong tendency to drape the

blame around his shoulders. For this reason, great care must be taken to examine the evidence in a cold and rational light. Looking at the evidence as a whole, it is obvious the State failed to sufficiently prove that if Appellant were in a condition of intoxication when he hit Omar, it was such condition that caused Omar's death.

Evidence of the essential element that Appellant's intoxication was the cause of Omar's death is insufficient. This case should be reversed and Appellant acquitted. Under the *Jackson* standard, "a rational jury would necessarily entertain a reasonable doubt as to the Appellant's guilt, the due process guarantee requires that we reverse and order a judgment of acquittal. *Jackson v. Virginia*, 443 U.S. at 317–20, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Burks v. United States*, 437 U.S. 1, 11, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

## POINT OF ERROR TWO

**POINT OF ERROR TWO IS THAT THE CUMULATIVE EFFECT OF PROSECUTORIAL MISCONDUCT DEPRIVED APPELLANT OF DUE PROCESS OF LAW AND DUE COURSE OF LAW.**

### RELEVANT FACTS

The State's trial counsel, Kayla Allen, established that both she and Kacey Launius, Allen's co-counsel, in the capacity of the District Attorney's

Vehicular Crimes Unit, attended and watched officers work the accident scene during the active investigation. V. 8, p. 197, ll 3-23; p. 199, 2-14; V. 9, p. 9, ll 11-19. Allen continued to participate in the investigation by securing a search warrant for Appellant's blood and then transporting that blood from Clear Lake Regional Hospital. V. 9, p. 20, ll 12-25; p. 21, ll 1-22.

Near the end of its case in chief, the State sponsored two reluctant witnesses, Amber Buckles Jennings, Appellant's fiancé, and Justin Linkey, Jennings' son. V. 9, p. 28, ll 12-15; p. 155. Linkey elected not to testify, invoking a 5th Amendment right against self-incrimination. V. 9, p. 27, 18-21. The Trial Court granted Linkey immunity upon the State's motion, and compelled Linkey to testify. V. 9, p. 153, ll 21-25; p. 153, ll 1-16.

The State asked both Jennings and Linkey only two categories of questions: 1. Whether they saw Appellant drinking on the day in question, and; 2. To recount their substantial felony convictions. V. 9, p. 32, ll 4-5; p. 42, ll 5-24; p. 43, ll 12-25; p. 44, ll 1-10; p. 161 ll 18-24; p. 162, ll 16-25; p. 163, ll 9-14, 18-25. While Jennings and Linkey were on the stand, the State told each of them, in front of the jury, that she was "legally obligated" to ask them about criminal convictions if they were felonies or crimes of moral turpitude. V. 9, p. 41, l 25; p. 42, ll 1-4; p. 161, ll 9-14.

## SUMMARY OF THE ARGUMENT

The record as a whole shows that Appellant was denied his due process of law and due course of law right to a fair and impartial trial in that the prosecutor presented a series of statements for the jury which had the effect of vouching for the testimony of witnesses who might prove her case; and, the prosecutor improperly detracted from Appellant's credibility by sponsoring two witnesses, close companions of Appellant, for the chief purpose of impeachment, resulting in a constructive impeachment of Appellant. These prosecutorial acts unfairly prejudiced Appellant to such a degree as to undermine a fair process for Appellant.

## ARGUMENT AND AUTHORITIES

In the guilt/innocence phase of Appellant's trial, there was a running string of testimony placing both the State's trial counsel as fact witnesses to the accident scene, the accident reconstruction, evidence gathering, securing a search warrant for evidence of Appellant's blood/alcohol content and chain of custody for Appellant's blood/alcohol evidence. The State's position as evidentiary witnesses amounted to improper vouching. Additionally, the State called two of Appellant's close companions to testify to the element of intoxication as an apparent pretext for impeaching them with lengthy criminal history. (The State had already introduced evidence of Appellant's

intoxication from officers, medical personnel, lay witnesses and blood testing.) The State's true intent for calling Appellant's companions was made clear when the State misstated the law in the presence of the jury, telling each of Appellant's companions that <u>the law required her</u> to impeach them with their felony and moral turpitude convictions. This improper handling of the witnesses produced little evidence of the issue of intoxication, but had the great effect of impugning Appellant's character by association. Each of the acts of misconduct strung together created a pervasive prejudicial effect in favor of the State and to the detriment of Appellant in violation of his right to due process of law under the U.S. Constitution Amendments V and XIV and his right to due course of law under the Texas Constitution, Article 1, Section 19. United States Constitution, Amendment V; United States Constitution Amendment XIV; Texas Constitution, Article 1, Section 19.

Appellant did not object to the evidence at trial. Generally, error must be preserved by a timely, specific objection followed by a request for instruction to disregard and a motion for mistrial in order to be reviewed on appeal. *Penry v. State*, 903 S.W.2d 715, 764 (Tex. Crim. App. 1995). Even so, there exist cases where a serious and continuing prosecutorial misconduct undermines the reliability of the fact finding process, resulting in

16

deprivation of fundamental fairness and due process of law. *Rogers v. State*, 725 S.W.2d 350, 360 (Tex. App. –Houston [1ˢᵗ Dist.] 1987, no pet.). The facts of each case must be examined individually to determine whether the probable effect of prosecutorial misconduct on the minds of the jurors requires reversal. *Bautista v. State*, 363 S.W.3d 259, 263 (Tex. App.-San Antonio 2012, no pet.).

<u>Improper Vouching</u>

Allen established through two of her witnesses that she or both she and her co-counsel were fact witnesses to the active investigation of the case on trial. Neither Allen nor Launius swore an oath or testified subject to cross-examination. Evidence of Allen's and Launius' roles as special prosecutors assigned to the earliest phase and continuing phases of the investigation, corroborated witness testimony as to critical issues in the case: (1) How the collision occurred; (2) Where the collision occurred; (3) Why the collision occurred; and, (4) Whether Appellant were intoxicated.

First, Allen established that the prosecutors were on the accident scene in their role as special prosecutors of the Vehicular Crimes Unit. Jeremy Creech, Galveston County Sheriff's Office, accident reconstructionist, testified as follows.

**Q.** As part of the fatality, especially a fatality like this, is the DA's office called?

**A.** Yes.

**Q.** In any type of vehicle fatality in our county, what DA is always called?

**A.** You.

**Q.** Do you know why that is?

**A.** You're the head of the vehicle crimes unit.

**Q.** On this scene, did I come to the scene?

**A.** Yes, you did.

**Q.** And did Kacey also come to the scene?

**A.** Yes, she did.  V. 8, p. 197, ll 3-14.

On its face the information came out without warning, offering no opportunity for Appellant to object.  Neither Allen's or Launius' name appeared in the State's Witness list on file before trial.  T.R. 161-164.  It appears that Appellant learned both trial prosecutors were witnesses at the same moment the jury learned that fact. Allen asked whether the District Attorney's Office was always called to the scene in such cases.  Following an affirmative answer Allen asked, 'who?', and Creech answered, "you".  V. 8, p. 197, ll 3-14.  There was no reason to forsee that the District Attorney's

Office was at the scene, or that the Office was represented by Allen and Launius. (See *Issa v. State* where error preserved even though no objection because there was no opportunity to object at trial. *Issa v. State*, 826 S.W.2d 159, 161 (Tex. Crim. App. 1992).)

Even if Appellant had been able to properly preserve error, it would have done no good. The Court of Criminal Appeals has recognized that cases exist where objection and instruction to disregard could not have removed the harm. *Brown v. State*, 692 S. W.2d 497, 501 (Tex. Crim. App. 1985) (en banc). Error will not be cured where it appears that the question alone is clearly calculated to inflame the minds of the jury and is of such a character as to suggest the impossibility of withdrawing the impression produced on their minds. *Id*.

At Appellant's trial, the State elevated her influence with the jury in the way she characterized the case, "especially a fatality like this" and then set herself out as the "authorized" person in the District Attorney's office to respond to the active investigation of the accident scene. No objection or instruction to disregard could have removed the special status the State portrayed of herself and her co-counsel.

David Balchunas, Galveston County Sheriff's Office, Lieutenant, Investigation, also testified at Appellant's trial on direct examination that

19

Allen, in her role with the District Attorney's Office, responded to the live accident scene. V. 9, p. 6, ll 15-16.

> Q. Who else would be called out to the scene?
>
> A. The forensic investigators are going to be called out to a scene like that. Additional personnel for scene security, in other words, to keep the scene from being contaminated or disturbed in any way. **And in this case the district attorney's office was called to respond because it was possibly going to be a fatality** which it turned out to be. **So I believe you, and that would be Kayla Allen, responded to the scene as well.** *(Emphasis added.)* V. 9, p. 9, ll 11-19.

Next, Allen lent her personal corroboration of Creech's crime scene testimony by establishing that Allen and Launius walked the scene with Creech as he was gathering evidence to reconstruct the accident.

> **A.** When I arrive I'm going to walk the scene. I'm going to look at the evidence that's left on the road, start evaluating it for myself. I'm going to talk with the officers that are there and any witnesses that may still be there. V. 8, p. 197, ll 15-23.

Q. **And as part of you walking the scene to make a visual assessment, would that be the part where if Kacey and I were at that scene you are walking us through what you are seeing on the scene?**

A. **Yes.**

Q. **And did you do that in this case?**

A. **Yes, I did.**

Q. Once you walk the scene, do you start making determinations of how the crash occurred?

A. Yes.

Q. And is that your role --- are you trying to figure out what happened in this instance?

A. Yes, ma'am. *(Emphasis added.)* V. 8, p. 199, 2-14.

In addition to participating in the accident scene, at Appellant's trial David Balchunas testified on direct examination that Allen went to a Harris County District judge and got a search warrant with him for Appellant's blood and for blood/alcohol results. Allen and Balchunas then picked up five vials of Appellant's blood along with documents from Clear Lake Regional Hospital and transported them.

Q. And in fatality cases, are there times where **we**

21

are more and more retrieving the blood from the hospital that was drawn for medical purposes?

A. **Yes, ma'am.**

Q. In this particular case, did the defendant have **what we call** residual left over blood at Clear Lake Regional when he went there for his ankle?

A. **Yes, ma'am.**

Q. And for **us** to recover that blood, what do **we** have to do?

A. **We** -- with his blood, he was in the hospital at Clear Lake Humana Hospital which is in Harris County. So in order to retrieve or legally retain that blood from the Harris County hospital, **I went along with Miss Kayla Allen to the Harris County District Attorney's office. We** had -- I had obtained a search warrant. Once I obtained a search warrant to obtain the residual blood from Mr. Forsyth, I went to the 177th District Court, talked to a Judge Gurney, and then she signed the search warrant. And, of course, I signed the affidavit as well. Once that was done, **we** went to the Clear Lake

Regional Hospital, met with the staff there; and they satisfied the search warrant by giving **us** five vials of the substances that **we** need along with other documentation.

Q. And what day, if you remember, did **we** go to the Harris County DA's office to have a search warrant drafted?

A. I'll tell you exactly when it was. It was July 20th is when **we** went up there.

Q. What year?

A. 2016.

Q. And once that blood was recovered, what do you then do with the blood?

A. Blood has to be refrigerated. It was given to **us** packaged. *(Emphasis added.)* V. 9, p. 20, ll 12-25; p. 21, ll 1-22.

Lieutenant Balchunas, having established on direct examination that Allen was at the crime scene, on cross-examination, Balchunas testified about witness interviews and blood alcohol evidence as follows.

Q. For instance, when you interviewed Mr. Douthit, his husband was not in the room at the same time because

you had to interview him as well; is that correct?

A. Correct. **We** are not going to have two witnesses in an interview, for obvious reasons, so they can't hear or it's known what's going on.

Q. And likewise, if you did any interviews at the scene, you would have all these people separated and you talked to them one on one?

A. Yes. If **we** talk to somebody, yes, it's going to be one on one. **We** try the best **we** can.

Q. What is changed that makes the hospital blood to be something that you want to pull in now, once you already have law enforcement blood? What's changed in terms of the last few years where the law enforcement blood is something that draws your attention?

A. In order to exercise on the side of caution, and in order to assure that, for legal purposes, in order to again, exercise on the side of caution, is why **we** elected to go up to Harris County to get the blood from the hospital. *(Emphasis added.)*

Q. Was that just to be able to compare it to the law

24

enforcement blood and show that the results are the same

or similar?

A. Blood is blood but --

Q. Yes, sir.

A. -- I think the main purpose was to look for the

blood alcohol content or any other substance that may

have been in the system of Mr. Forsyth.  V. 9, p. 25, ll 1-25; p.

26, ll 1-4.

There is no explanation for giving this information to the jury other than to possibly influence the witness testimony; to vouch for the State's witnesses; and, to possibly paint the State as having elevated credentials, increasing their persuasive ability.  Once the jury had this information nothing the Trial Court could have done would have cured the harm.

Allen also used her personal knowledge of the scene outside the presence of the jury in her bench argument attempting to admit a scene photograph, State's Exhibit "78" for identification.

**MS. ALLEN:** And, Your Honor, additionally the crash happened in the daytime. By the time **we took photos** of the scene, it was more nighttime. *(Emphasis added.)*  V. 8, p. 225, 12-14.

25

**THE COURT:** I really have a problem with pictures taken a year after the incident.

**MS. ALLEN:** Well, the point of these pictures is, Judge, he's coming off of here. There's nothing different about these photographs of this street being open for him to perceive this danger when he enters 10th and Jackson. That's how far back, 10th and Jackson. And we have a clear view of this entire road down this road. And there is nothing different on the sides of these pictures to back then. I mean, I can ask him that and clear it up. **I also was on scene myself.** (*Emphasis added.*)

**MR. LAVALLE:** Do you want to be a witness?

**MS. ALLEN:** I can ask him that question. V. 8, p. 228, ll 9-21.

In *House v. State*, two assistant district attorneys testified in the punishment phase of trial regarding the defendant's character. *House v. State*, 947 S.W.2d 251 (Tex. Crim. App. 1997) (en banc). Neither of the prosecutors was an advocate at trial. *Id* at 252. The reviewing court acknowledged that an advocate-witness poses potential harm to the opposing party in violation of the Texas Disciplinary Rules. *Id* at 253. The Disciplinary Rules state, in part, that generally, a lawyer shall not accept or continue employment as an advocate before a tribunal in a contemplated or

26

pending adjudicatory proceeding if the lawyer knows or believes that the lawyer is or may be a witness necessary to establish an essential fact on behalf of the lawyer's client. Texas Disciplinary Rules of Professional Conduct 3.08 (a) (2016).

Unlike the prosecutor-witnesses in *House*, Allen and Launius were the actual advocates at Appellants trial. Comment 4 of the Disciplinary Rules distinguishes a witness as a person who testifies based on personal knowledge, from an advocate who is a person expected to explain and comment on evidence given by others. *Id* at Comment 4. Where a lawyer assumes the dual role of advocate-witness, the fact-finder may not clearly understand when to accept a statement as proof or as an analysis of the proof. *Id*.

While the trial prosecutors, Allen and Launius, did not take the witness stand as did the prosecutors in *House*, Allen established herself and Launius as fact witnesses, essentially vouching for the truthfulness of the State's evidence. Additionally, whether consciously or not, Allen and Launius enjoyed the advantage of ensuring their witnesses testified in accordance with Allen's and Launius' personal memories of the facts. This was just the kind of undue influence the Witness Exclusion Rule was invoked to guard

27

against. Tex.R. Evid. 614. Ironically, it was Allen who requested the Rule at the beginning of the trial.

THE COURT: Okay. State, call your first witness.

MS. ALLEN: At this time, Your Honor, the state would invoke the rule.

THE COURT: The rule of witnesses has been invoked. And that means for both sides, make sure that none of your witnesses are in the courtroom except for their testimony. Also instruct your witnesses that they can't talk to other people about their testimony. They can talk to the attorneys about the testimony, but that's it. V. 7, p. 13, ll 19-25; p. 20, ll 1-4.

The purpose of invoking the Rule is to aid in the ascertainment of truth by preventing the testimony of one witness from influencing the testimony of another. *Parham v. Wilbon*, 746 S.W.2d 347 (Tex.App.--Fort Worth 1988, no writ).

The fact that the State made sure the jury knew she was a witness to various facts in the case such as how the scene appeared when it was fresh and under active investigation moved her from the role of advocate to witness without any safeguards to the veracity of the testimony. It was not

28

necessary to the State's case for Allen or Launius to be a witness. Such information was given to the jury without warning, and it undermined the confidence of a fair trial free from undue prejudice. Because the State told the jury that she herself and her co-counsel had personal knowledge of the accident scene, the process in which the search warrant was issued and the chain of custody for Appellant's blood evidence for the element of intoxication, everything the State said or advocated was given undue weight and credibility. Allen and Launius added the stature of their positions with the District Attorney's Office to the credentials of their witnesses without being subjected to the safeguards of oath, the Witness Exclusion Rule, or cross-examination. The jurors had in their minds the presence of Allen and Launius throughout the investigation as a result of repeated references to such by Allen. Because the State vouched for her evidence, the jury's role of determining credibility was reduced. Such conduct unfairly put a finger on the scale in favor of the State and denied Appellant a fair and impartial trial.

Unfairly Diminished Appellant's Credibility

At Appellant's trial, the State presented evidence of Appellant's intoxication through testimony of law enforcement officers, medical personnel and blood alcohol testing. In wrapping up their case, the State

called Amber Buckles Jennings, Appellant's fiancé, and Justin Linkey, Jenning's son, to testify as to evidence of Appellant's intoxication on the day of the accident. V. 9, p. 28, ll 12-15; p. 155. Jennings testified that Appellant drank one beer and that there was a bottle with about four shots of clear liquid in the house earlier that day. V. 9, p. 39, ll 20-25; p. 44, ll 21-24. Linkey testified that anything he told officers about Appellant's drinking in a videoed statement taken before trial must be true. V. 9, p. 158, ll 1-13; p. 159, ll 3-5, ll 8-10. While both witnesses were reluctant, (Linkey refused to testify until he was compelled under an order of immunity), they cooperated and answered the State's questions. V. 9, p. 27, ll 18-21; p. 153, ll 21-25; p. 153, ll 1-16. The State did not ask to treat the witnesses as hostile. After Jennings and Linkey testified about Appellant's drinking, the State questioned each of them about their significant history of felony convictions. V. 9, 32, ll 4-5; p. 42, ll 5-24; p. 43, ll 12-25; p. 44, ll 1-10; p. 16, ll 18-24; p. 162, ll 16-25; p. 163, ll 9-14, 18-25.

The Texas Rules of Evidence authorizes a party to attack the credibility of her own witness. TEX. R. EVID. 607. However, since the witnesses were called by the State, cooperated though reluctant, and there was an abundance of evidence regarding Appellant's intoxication already admitted, it appeared that the State called the witnesses as a pretext to impeach them

30

with felony convictions. Such impeachment did little or nothing to prove the element of intoxication, but was very effective in reaching across the courtroom and effectively impeaching Appellant with the company he kept. The tactic was made clear by the prosecutor's misstatement of TRE 609(a) to Jennings as follows.

Q. Are you on a felony probation right now?

A. Yes. Doing very, very well on it. But what does that have to do with anything?

Q. Well, I'm required by law to get into that if you do have a felony conviction or a crime of moral turpitude. So I'm required by law to ask you that question, okay?

A. Uh-huh. V. 9, p. 41, 22-25; p. 42, ll 1-5.

Q. Are you on probation?

The prosecutor made the same misstatement of TRE 609(a) in front of the jury to Linkey.

Q. Mr. Linkey, have you been recently convicted of a possession of controlled substance?

A. That doesn't pertain to this.

Q. I understand that. But by law, if you have

felonies or crimes of moral turpitude, I'm legally

obligated to let the jury know that.

A. Well, that still doesn't pertain to this court.

This ain't got nothing to do with him or my

brother-in-law.

Q. So I'm going to ask you gain: Were you recently

convicted of a possession of a controlled substance

where you're serving five years in prison?  V. 9, p. 161, ll 9-20.

The State appears to confuse what the trial court must admit with what an advocate may offer.   TRE 609 authorizes an advocate to impeach a witness with certain prior criminal convictions.  A court must admit evidence of a criminal conviction if it is a felony or a crime of moral turpitude.  TEX. R. EVID. 609(a) (1).  However, 609 does not compel an advocate to do so, rather, in instances where an advocate properly offers such evidence, 609 compels the court to admit it.  *Id*.  Misstating the rule of evidence protected the State from any appearance to the jury that she was "beating up on" Jennings and Linkey.  Such conduct gave the State an unfair advantage.

Continuous vouching for the State's evidence, putting Appellant's close companions on the stand for the primary purpose of impeachment and erroneously informing the jury that the law required her to impeach

Appellant's companions with felonies and crimes of moral turpitude had the effect of undermining fundamental fairness in Appellant's trial resulting in fundamental error. Prosecutorial misconduct, as in *Rogers*, "was pronounced and persistent, with a probable cumulative effect upon the jury". *Rogers* at 361. Appellant was denied due process of law and due course of law. The judgment of the Trial Court should be reversed and Appellant should receive a new trial.

## PRAYER

For the above reasons, the Appellant respectfully requests the judgment of the trial court be reversed and that Appellant be acquitted. Should Appellant not be acquitted, Appellant respectfully requests the judgment of the trial court be reversed and that Appellant be granted a new trial.

Respectfully submitted,

/s/ Winifred Weber
Winifred Weber
2525 Bay Area Blvd., Suite 310
Houston, Texas 77058
Telephone: (281)488-9040
Facsimile: (281) 488-9009
Electronic mail: winifredweber@gmail.com
SBOT 01672500

## CERTIFICATE OF COMPLIANCE
## REGARDING FONT AND WORD COUNT

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), I hereby certify that this brief contains <u>7,277</u> words (excluding the caption, table of contents, index of authorities, signature, proof of service, certification, and certificate of compliance). This is a computer-generated document created in Microsoft Word, using 14-point typeface for all text, except for footnotes which are in 12-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

Respectfully submitted,

<u>/s/ Winifred Weber</u>
Winifred Weber,
Attorney for Appellant

## CERTIFICATE OF SERVICE

I, Winifred Weber, Attorney at Law, 2525 Bay Area Blvd., Suite 310, Houston, Texas 77058, do hereby certify that APPELLANT'S BRIEF SPECIFYING ERROR OF WHICH APPELLANT COMPLAINS ON APPEAL, was served to Jack Roady Criminal District Attorney, Galveston County Courthouse, 600 59th Street, Suite 1001 Galveston, Texas 77551, by electronic mail at Rebecca.Klaren@co.galveston.tx.us on the 21st day of March, 2018.

<u>/s/ Winifred Weber</u>
Winifred Weber
Attorney for Appellant